**DUKE CITY LUMBER CO. et al.,
Plaintiffs,**

v.

**Earl L. BUTZ, Secretary of Agriculture,
et al., Defendants,
and
Bennett Lumber Products, Inc., et al.,
Intervening Defendants.**

**Civ. A. No. 2152–72.**

United States District Court,
District of Columbia.

Aug. 28, 1974.

---

2. *See also* the discussion in *Escalera* 425 F.2d at 865–866 with regard to "state [court] review".

Angelo A. Iadarola, Pierre J. LaForce, Washington, D. C., of counsel, Wilkinson, Cragun & Barker, Philip A. Nacke, Jerry R. Goldstein, Attys., Washington, D. C., for plaintiffs.

Earl J. Silbert, U. S. Atty., Arnold T. Aikens, Ann S. DuRoss, Paul M. Tschirhart, Asst. U. S. Attys., of counsel, for defendants.

Eric S. Benderson, for Small Business Administration.

Robert M. Simmons, Washington, D. C., for Dept. of Agriculture.

Mark P. Schlefer, Richard S. Salzman, William H. Fort, Washington, D. C., for intervening defendants, Bennett Lumber Products, Inc., and others and Alsea Lumber Co., and others.

H. Robert Halper, Philip R. Hochberg, Terence P. Boyle, Washington, D. C., for intervening defendants National Independent Forest Industries Committee, Southeastern Lumber Manufacturers Association and others; Kominers, Fort, Schlefer & Boyer, O'Connor & Hannan, Washington, D. C., of counsel.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

These parties are before the Court on Cross-Motions for Summary Judgment. At issue in this suit is the legality of the 1971 small business timber set-aside program as established by the Memoran-

dum of Understanding[1] between the Small Business Administration (SBA) and the United States Department of Agriculture (USDA).

The Plaintiffs, twelve forest product manufacturing companies, who are ineligible for the program because of their size,[2] have asked the Court to declare the program illegal and enjoin its further implementation by the U. S. Forest Service. The Plaintiffs attack the program as an example of an agency's arbitrary and capricious rulemaking overriding considerations of statutory authority, rational decisionmaking, administrative due process, as well as the applicability of environmental statutes, national forest administration statutes and other federal laws.[3]

The Defendants in this case are the Secretary of Agriculture, the Chief of the U.S. Forest Service, and the Small Business Administrator. A number of independent small forest products manufacturers and several associations have been permitted to intervene as Defendants, having demonstrated that they have a direct interest in the continuation of the 1971 set-aside program.

Upon careful consideration of the voluminous pleadings and exhibits filed in this action, as well as the able argu-

ments of counsel, and there being no material fact in issue, the Court will grant the Defendants' Motion for Summary Judgment for the reasons set forth below.

## I. BACKGROUND

The 1971 set-aside program and its 1958 predecessor have their roots in the Small Business Act. 15 U.S.C. § 631 et seq. Congress considered small businesses to be the backbone of the American system of private enterprise and free competition. Finding that the nation's economic security and well-being depended upon the continued existence of small business, Congress created the Small Business Administration to assist and protect small businesses in so far as possible. In particular, the SBA was directed to work with other agencies to insure that small businesses received a "fair proportion" of the total sales of government property. 15 U.S.C. § 644 (4).

Pursuant to this directive, in 1958 the SBA and USDA established the mechanism for the first timber set-aside program.[4] The program was administered, however, on an *ad hoc* basis. The Forest Service would reserve a timber sale solely for small business competi-

---

1. The agreement was signed December 29, 1971. The 1971 program supplants an earlier set-aside program established December 2, 1958 and amended in 1966. The procedure for implementing the 1971 program is contained in the Forest Service Manual Amendment No. 67, Paragraphs 2431.11– 2431.19. The SBA and the USDA administer the program jointly.

2. 13 C.F.R. 121.3–9(b) provides a standard of 500 employees or less to measure a business' eligibility for the program.

3. Specifically, the Plaintiffs allege the SBA– USDA action falls outside the statutory authority of the Small Business Act, 15 U.S.C. §§ 631(a) and 644; that it has no rational basis in fact; and that it is violative, (1) of the 5th Amendment as deprivation of property without due process or just compensation; (2) of the rule-making requirements of Sec. 4 of the Administrative Procedure Act, 5 U.S.C. § 553; (3) of the National Environmental Policy Act of 1969, 42 U.S.C.

§§ 4321–4347, and Executive Order No. 11514 for failing to file an environmental impact statement; (4) of federal statutes governing the administration of the National Forests, namely, 16 U.S.C. §§ 581, 582a, 583, 475, 476, 528–531, 590a, 594–1, and 594a; (5) of the Employment Act of 1946, 15 U.S.C. § 1021; and (6) of the Economic Stabilization Act Amendments of 1971, 15 U.S.C. § 1026(a).

4. Under the 1958 program in some regions the Forest Service used a three year "rolling" base average to determine small business' share of the timber market when calculating set-aside needs. The "rolling" concept meant a three-year average, which was revised every year to reflect a new three-year period. Deposition of Gene F. Van-Arsdale, Chief Prime Contracts and Property Sales Division, Office of Procurement Assistance, Small Business Administration, taken January 25, 1974 (hereinafter, *Van-Arsdale Deposition*) at 16–17.

tion, only if a "need" could be factually demonstrated. This proof was often difficult to establish, as any evidence submitted could be rebutted by other interested parties who would not necessarily benefit from a set-aside.

With the decline in the number of timber purchases by small businesses[5] and the increase in the number of acquisitions of small concerns by large companies[6] (including the Plaintiffs) the SBA re-examined the set-aside program. The SBA found the 1958 set-aside program to be too ineffective to insure small business a "fair proportion" of national forest timber sales. The procedure for instituting a set-aside sale was cumbersome.[7] The program had no definite guidelines for determining either when a timber set-aside was necessary or the volume of timber needed to be set aside.[8]

The present set-aside program modified the 1958 program in three aspects.

There is an historical approach for determining "fair share", a five-year time period for determining base average shares of timber purchases, and a triggering mechanism for initiating set-asides.

The SBA has taken the timber sales of 1966–70 and has computed the percentages of the total volume of timber sold to large and small business respectively in each market area.[9] This ratio, based upon a history of actual purchases, sets the framework for the SBA definition of "fair proportion" and it is used in subsequent computations. Every five years,[10] the base period percentages in each market area are revised to provide flexibility and reflect current sales. The Agreement, Paragraph 4a, provides, however, that the recomputed percentages cannot be reduced to more than 50% of the original base period of 1966–70.

5. A survey of six Forest Service Western Regions showed small businesses had purchased 75% of the National Forest timber in 1958 and 44% in 1966–70. USDA, Forest Service, *Environmental Analysis Report, Small Business Administration Set-Asides for National Forest Timber Sales* dated January 30, 1974, filed February 5, 1974 as a supplemental answer to Plaintiffs' Interrogatory No. 6e (hereinafter, *Report*) at 6.

The SBA received reports that high bids by larger timber companies precluded small business from competing in unrestricted sales because they could not process the timber at a profit. *VanArsdale Deposition* at 170, 182, 209. The SBA had further reports of successful higher bidding by large companies who had not previously competed in a particular forest. *Id.* at 179.

See Government's Answers to Plaintiffs' Interrogatories, Exhibits A–1 through A–5 for an indication of large business' significant increases in national forest timber purchases.

6. Affidavit of Mr. VanArsdale attached to the Defendants' Motion for Summary Judgment filed August 30, 1973 (hereinafter, *VanArsdale Affidavit*) at par. 7 & 8. See also, Exhibit 4 of VanArsdale Affidavit, which is a memorandum of November 19, 1970 indicating the mergers of small companies into large ones in California for the two previous years. See also, *VanArsdale Deposition* at 152.

7. To institute a set-aside, a small business had to submit a complaint. There then had to be finding of "need" by the SBA timber specialist. The proof of need was then submitted to the regional Forest Service supervisor for his finding. If the two agreed a set-aside sale was instituted. Deposition of Mr. Paul E. Neff, Retired Director of Timber Management, Forest Service, USDA, taken January 18, 1974 (hereinafter, *Neff Deposition*) at 12–14, 20, 24; *VanArsdale Deposition* at 11, 12–24.

8. *VanArsdale Affidavit*, at par. 6.

9. The SBA administers the program in a manner which provides for regional differences such as competition, manufacturing facilities, timber species, marketing characteristics. The local geographical unit, if used for base shares and other tabulations, is called a market area. This area usually coincides with a national forest. However, there are examples of one national forest being divided into several market areas and vice versa. *Id.* at par. 17.

10. A five-year period was chosen: (1) to average out some periodic fluctuations and inequities; and (2) to provide a period of time which would give the most recent yet historically accurate picture of timber purchases by large and small concerns. *Id.* at par. 16.

Every six months there is a review of the timber purchases in each market area for the previous six months. If the review shows that the small business purchases equal an accumulated net deficit of ten or more per cent than the base period percentage, a set-aside sale is triggered. Had small business purchased a volume of timber above this trigger point but below the base period percentage, there would be no set-aside sale in the following six months. Any surplus above the small business share is carried over from period to period to offset any deficit. Likewise, any deficiency less than 10 per cent is carried over from period to period until the accumulated deficit reaches 10 per cent at which point the set-aside program is triggered.

The 1971 program retains the 1958 restrictions on small business' resale of timber purchased in a set-aside sale to large business. Forest Service Manual § 2431.12.[11] The program does permit large concerns to purchase any set-aside timber which small business fails to purchase. 36 C.F.R. § 221.8. Furthermore, under Paragraph 4b of the 1971 agreement, any such set-aside timber large business purchases is counted toward the base share of small business.

Despite the agreement's precise triggering mechanism, if a proposed set-aside sale would be inappropriate or work an undue hardship, the sale can be eliminated or triggered upon a different percentage deficiency.[12] As a final safety catch, Paragraph 6 of the Agreement permits a set-aside to be withdrawn after it has been programmed, if subsequent events indicate a set-aside sale would not be in the public interest.

Small business purchases a major portion of its national forest timber in unrestricted sales. In fact, only five per cent of the total volume of national forest timber has been sold at set-aside sales. During the 2½ years that the program has been in effect (January 1971–June 1973), the Forest Service has sold approximately 23 billion feet of sawtimber which falls within the set-aside program. Small business has purchased 11.2 billion feet. However, only 1.3 billion of the 11.2 billion feet was purchased in set-aside sales.[13]

## II. THE PLAINTIFFS HAVE STANDING TO BRING THIS ACTION UNDER THE BALLERINA PEN STANDARD.

The threshold issue before the Court is the question of standing. The Plaintiffs predicate their standing on Sec. 10 of the Administrative Procedure Act. 5 U.S.C. § 702.[14]

■ This Circuit has adopted a liberal position regarding a party's standing

11. Small business must agree that it will not sell more than 30 per cent of the timber acquired in a set-aside sale. The 30 per cent restriction can be changed in those geographical areas where it is appropriate due to the nature of the industry (i. e., the 50 per cent restriction in Alaska). The restriction applies only to a resale to a large business. It does not apply to timber exchanges with large business, nor does it apply to a resale to a small business. The restriction in no way affects a small business' resale of timber purchased in an unrestricted (i. e., non set-aside) sale of national forest timber.

12. Paragraph 4c of the 1971 Agreement provides:

"The above provisions do not preclude USDA and SBA from taking other factors into consideration in specific cases when computing base average share, nor *from otherwise establishing or eliminating set-asides which they deem appropriate* under the Small Business Act. USDA and SBA may make allowance for such factors as past long-term sales, large salvage sales, or other unusual considerations, when computing the base average share." (emphasis added).

13. *Report* at 12. Thus, small business has purchased approximately 89 per cent of its national forest timber purchases through unrestricted sales.

14. Section 10 of the Administrative Procedure Act provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

to challenge administrative action. *E. g.,* Ballerina Pen Company v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970), cert. dismissed 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971); Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). This position stems from a combination of the Court's experience that a person who brings an action challenging agency activity is one who most invariably has been injured either directly or indirectly by that action, and the crucial need to insure that agency action, ostensibly taken to promote the public good, is founded upon the proper basis of Congressional authority rather than mere good intention, personal insight, prejudice or predilection. *Ballerina Pen Co., supra* at 102, 433 F.2d at 1208–1209.

■ In *Ballerina Pen,* the Court of Appeals adopted a three-part standard to test a party's standing in challenges to administrative action.[15] Under it, a plaintiff has standing if (s)he alleges (1) that the challenged action has caused or will cause the plaintiff injury in fact, so as to insure that (s)he has a personal stake in the outcome of the controversy; (2) that the agency action was arbitrary, capricious, and in excess of statutory authority so as to injure an interest "arguably" within the zone of interests to be protected or regulated by the statute in question; and (3) that there must be no "clear and convincing" indication of a legislative intent to withhold judicial review. 140 U.S.App.D.C. at 101, 433 F.2d at 1207, citing Association of Data Processing Service Organizations v. Camp (ADPSO), 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Scanwell*

*Laboratories, supra,* at 381, 424 F.2d at 869, 875 n. 10, 19.

■ The Plaintiffs meet the three requirements of the *Ballerina Pen* standard. The crux of the Plaintiffs' complaint is that the implementation of the 1971 set-aside program penalizes their natural growth, freezes, in perpetuity, their size, location and relationships within the industry at the 1966–70 level, and interferes with their prospective beneficial business relationships. The Court is of the opinion that this allegation is sufficient to meet the injury in fact requirement. *Cf. Assoc. Data Proc. Ser. Org., supra; Scanwell Laboratories, supra;* Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964); *see also,* Superior Oil Co. y. Udall, 133 U.S.App.D.C. 198, 409 F.2d 1115 (1969).

■ As to the second criteria, the Plaintiffs argue that the SBA has irrevocably imposed an arbitrary market structure upon the industry—a structure contrived without consideration of economic realities, the natural changes in the industry structure or who is the actual purchaser of the national timber. It would appear that the Plaintiffs' interest in achieving its maximum economic potential within the American system of private enterprise is "arguably" within the zone of interests sought to be protected by the Small Business Act. The Act seeks to promote a continuation of free competition. The Act attempts to realize this goal by assisting small businesses to achieve their maximum potential. The purposes of the Act would not be achieved, however, if the aid to small business consisted of a structure which undermined the vitality of other businesses within the industry. Inherent in such action are the seeds of

15. This standard is applicable even in the absence of specific "person aggrieved" language in the statute under which the action is brought.

It must be remembered that a correct analysis of the question of standing requires the Court to look at the party's status and not at the merits of the case. Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.

App.D.C. 31, 35, 433 F.2d 1137, 1141 (1970); *Scanwell Laboratories, Inc., supra,* at 383–384, 424 F.2d at 873. A summary judgment proceeding under Rule 56 of the Federal Rules of Civil Procedure is a prime vehicle with which to eliminate frivolous lawsuits parties can bring under this liberal test for standing.

destruction of the same free system the Act is intended to protect.

■ In considering the last requirement, it is quite plain that the Small Business Act does not contain any clear and convincing provision indicating that the SBA Administrator's discretionary actions are precluded from judicial review.[16] Therefore, the Plaintiffs have standing to pursue this action.

## III. THE DECISION TO INSTITUTE THE 1971 SET-ASIDE HAD A RATIONAL BASIS AND WAS WITHIN THE ADMINISTRATOR'S STATUTORY AUTHORITY.

The real bone of contention in this suit is the Administrator's decision to change the 1958 program.[17] The Plaintiffs take umbrage with the implementation scheme of the 1971 program because it effectively protects the existence of small timber businesses at the expense of Plaintiffs' increasing quasi-monopoly of the industry.[18] It is apparent from the factual record in this case that the policy of the Act motivated if not mandated the change in the program.

■ The Small Business Act clearly grants the Administrator wide discretion to effectuate the purposes of the Act. 15 U.S.C. § 634. This fact the Plaintiffs do not contest. Rather, they argue that the Administrator's substantive decision in this matter was arbitrary, capricious, and beyond the scope of his statutory authority.

---

16. Section 634(b)(1) of the Small Business Act, which prohibits the issuance of an injunction against the Small Business Administrator "in the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter," is not clear and convincing evidence that the Administrator's action in this instance is precluded from judicial review. Despite the wide discretion and broad powers with which the Administrator is vested, it would appear from the language of § 634 that there is a limitation. Thus, the Court would have the power to review the action and declare it illegal if it was beyond the Administrator's statutory authority. In the instant case, any injunction would issue against the Director of the Forest Service as the implementor of the action, rather than the SBA Administrator.

17. Despite their protests to the contrary, the Plaintiffs do not attack the principle of a set-aside program. It is obvious that Section 644 of the Small Business Act commands the Administrator and the disposal agency to set aside a fair proportion of government property for the exclusive benefit of small business. E. g., Allen M. Campbell Co. v. Lloyd Wood Const. Co., 446 F.2d 261, 264–265 (5th Cir. 1971). Mid-West Construction Ltd. v. United States, 387 F.2d 957, 181 Ct.Cl. 774 (1963); Massey Services, Inc. v. Fletcher, 348 F.Supp. 171 (N. D.Cal.1972); American Electric Company v. United States, 270 F.Supp. 689 (D.Hawaii 1967); see 41 Comp.Gen. 306, 311 (1961). Section 644 explicitly states that small business: "[S]hall . . . be awarded any contract for the sale of Government property, as to which it is determined by [the Small Business Administrator] and the contracting procurement or disposal agency . . . to be in the interest of assuring that a fair proportion of the total sales of Government property be made to small-business concerns." (emphasis added)

It is also clear that Congress contemplated the use of set-aside sales for small business in the timber industry. See the remarks of Senators James Murray (D., Mont.) and Wayne Morse (D., Ore.) during the debate on the amendment to extend the coverage of the Small Business Act to include the sales of government property.

18. The Plaintiffs contend that the set-aside program precludes them from substantial amounts of federal timber and thereby impairs their ability to operate at present levels. Upon examining the Plaintiffs' Answers to the Intervening Defendants' Interrogatories, it appears that under the set-aside program, the Plaintiffs have purchased not only their average 1962–1970 share of the national forest, but in several cases have doubled this average. See, Intervening Defendants Motion for Summary Judgment, Exhibit E.

The Plaintiffs have downplayed the facts that often the larger companies have access to private timber held in fee or obtained through timber exchanges to which small companies do not have access. Nor do they emphasize that their revenues and profits continue to increase and that they also grow through acquisitions, despite the "freeze" placed upon the industry by this program.

The scope of this Court's review in the instant case has been delimited by the standard set forth in Citizens to Preserve Overton Park v. Volpe, 401 U. S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This Court must examine whether the administrative decision was based upon a consideration of the relevant facts and law, and determine whether there has been a clear error of judgment. It is not the Court's duty to weigh the alternatives available to the Administrator and to determine which is the more reasonable. Ray Baillie Trash Hauling, Inc. v. Kleppe, 477 F.2d 696, 703–704 (5th Cir. 1973); see, Allen M. Campbell Co., Gen. Con., Inc. v. Lloyd Wood Construction Co., 446 F.2d 261, 265 (5th Cir. 1971).

The Plaintiffs argue that the Administrator's decision has no rational basis on two counts. First, they claim there was no "proven need" for a uniform, objective triggering apparatus. Second, they allege the computations and formula upon which the program rests are an irrational determination of the statutory "fair proportion".

As a matter of clarification, it should be stated that small business' "need" is not a factor which the Administrator must take into consideration. The "need" has already been established by the Act.

The Plaintiffs' other points regarding the basis of the Administrator's decision consist of unsupported allegations. They offer no evidence contradicting the Administrator's factual determination that small businesses were on the decline at the expense of large business' significant growth. (See a discussion of the Administrator's findings, *supra*, at 366–368.) The Plaintiffs, furthermore, have made no showing that the Administrator's choice of 1971 program was a clear error of judgment in light of other alternatives.[19]

The Administrator adopted the 1971 program after examining the historical position of small business within the timber industry and the problems inherent in the 1958 set-aside program and after listening to the suggestions of members of the industry and weighing the proposed alternatives. The program appears to be the reasonable, precise yet flexible, means of insuring that small businesses receive a "fair proportion" of government timber sales. The ratio of timber sales which the program seeks to preserve is based upon the competitive history within the industry. Small business is guaranteed no more than an opportunity to bid on that proportion of the market which it has purchased in the past.

The Plaintiffs' tangential argument regarding possible Congressional limitations upon the Administrator's admittedly wide discretion is without merit. The Plaintiffs maintain that there is a strong inference that Congress does not approve of a set-aside scheme of the type of the 1971 program. To support this inference the Plaintiffs argue that Congress defeated a Resolution[20] which would have brought to the floor of the House a Bill[21] containing a subsection legislating mandatory set-asides similar to the Administrator's 1971 program.[22]

---

19. See, *VanArsdale Deposition* at 75–9; Exhibits B–1 through 65 and D–1 through D–5 attached to the Government's Answers to the Plaintiffs' Interrogatories.

20. H.R.Res. 799. Debate on the resolution, 116 Cong.Rec. Part 4 pp. 5099–5117 (Feb. 26, 1970). Several members of the House voted to defeat the resolution as they felt consideration of H.R. 12025 should be postponed until after the issuance of the Report of the Public Land Law Review Commission on June 30, 1970.

21. The National Forest Timber Conservation and Management Act of 1969 (H.R. 12025, 91st Cong., 1st Sess.) The Bill's initial emphasis was to increase the timber supply in the face of soaring timber and plywood prices. The Bill was never voted upon. 115 Cong.Rec., Index, Part 31, page 1937 (1969); 116 Cong.Rec., Index, Part 34, page 1329 (1970).

22. Section 7(5) of the Bill directed the Secretary of Agriculture to establish policies which would assure that small businesses collectively would obtain a fair proportion of

The Plaintiffs also point to the Bill's accompanying report which contains a clause saying the 1958 set-asides were satisfactory.[23] Any conceivable limitation of the Administrator's discretion which could be inferred from this tenuous evidence is rebutted by other Congressional statements which unequivocably laud the 1971 timber set-aside program.[24]

Based upon the evidence in the record, the Court can only conclude that the Administrator acted within the scope of his statutory duty, in a rational manner, after full consideration of the relevant factors.

## IV. THE PLAINTIFFS WERE NOT DENIED ADMINISTRATIVE DUE PROCESS

One of this Court's long-standing concerns has been the enforcement of the Administrative Procedure Act's procedural rulemaking provisions. 5 U.S.C. § 553. The Court's concern is embedded in the belief that administrative agencies have a fundamental responsibility to insure that any rules and regulations which affect the day-to-day existence of our citizens be conceived in an atmosphere immune from prejudice. Upon examination of the facts in this case, however, the Court fails to see how the Plaintiffs can seriously complain that they were prejudiced because the agency did not comply literally with the notice and hearing requirements under Section 4 of the Administrative Procedure Act. 5 U.S.C. § 553.

■ Overlooking for the moment that matters relating to government contracts and property are specifically exempted from the notice and hearing requirements of Section 4,[25] the facts indicate that the Plaintiffs not only had actual notice of the proposed change,[26] but they also attended several industry-wide meetings at which the proposed program was discussed in depth.[27] Furthermore, the Plaintiffs' representatives met privately with agency officials,[28] and sub-

---

the total timber sold in each year from each national forest.

The accompanying House Report stated this provision was added to increase the cooperation between the Small Business Administration and the Forest Service to assure small businesses who had suffered along with the rest of the forest industry from the general shortage of timber, could obtain that proportion of the total timber sold annually which represented their collective average percentage of timber from each national forest over the preceding 3 calendar years. H.R.Rep.No. 91–655, 91st Cong., 1st Sess. 10 (1969).

23. Id. The remark in context is:
"An agreement between the Department of Agriculture and the Small Business Administration pursuant to the 1958 Small Business Act requires that a fair proportion of national forest timber sales be reserved for small business. *The system apparently has worked well* although the small producer, along with the rest of the industry, has suffered from the general shortage of timber as documented in the March 1969 hearings before the Banking and Currency Committee". (Emphasis added).

24. H.R.Rep.No. 92–1006, 92nd Cong., 2nd Sess. (April 1972) at 17–18.

25. 5 U.S.C. § 553 provides: "(a) This section applies, according to the provisions thereof, except to the extent that there is involved . . . (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."

26. 5 U.S.C. § 553(b) provides: "general notice of proposed rule making shall be published in the Federal Register, *unless persons subject thereto* are named and either personally served or *otherwise have actual notice* thereof in accordance with law." (Emphasis added)

27. Meetings were held in Phoenix, Arizona on Feb. 16–18, 1971; Washington, D.C. on March 2, April 22 and July 27–28, 1971, and Portland, Oregon on June 10, 1971. See Exhibit D–1 of the Government's Answers to Plaintiffs' Interrogatories for the minutes of the Phoenix meeting. The minutes consist of a 21 page single-spaced typed report. See also, Exhibits B–1 through B–65 and D–2 through D–5 attached to the Government's answers to the Plaintiffs' Interrogatories for an indication of the extent to which industry participated in the evolution of the program.

28. The Ad Hoc Committee of Federal Timber Purchasers representing the Plaintiffs met with representatives of the SBA and the Forest Service in late July 1971.

mitted an in-depth analysis of the program.[29] As a result of this industry input, the SBA–USDA received and considered many suggested alternatives. Some were adopted. For example, a triggering procedure was incorporated, supplanting an automatic set-aside procedure which had been previously proposed.[30] In light of these facts, the Court is compelled to find that the Plaintiffs were neither prejudiced nor denied due process. They had sufficient opportunity to participate in the development of the 1971 program. The Plaintiffs can not now claim, in spite of their active participation, that they were prejudiced because the Defendants failed to comply with the formalistic requirements of Section 553. *See,* United States v. Elof Hansson, Inc., 296 F.2d 779, 48 CCPA 91 (1960); *see also,* Florida Citrus Comm. v. United States, 144 F.Supp. 517, 521 (N.D.Fla.1956).

 Nevertheless, the fact remains that Section 553(a) specifically exempts an agency when making rules regarding public property[31] or contracts. When the government is dealing with these matters, Congress affords the government complete discretion to decide what, if any, public rulemaking procedures it should adopt and follow.[32] The Senate Committee on the Judiciary, in its report on this exception to the APA stated:

> "The exception of proprietary matters is included because the principal considerations in most such cases relate to mechanics and interpretation of policy and it is deemed wise to encourage and facilitate the issuance of rules by dispensing with all mandatory procedural requirements . . ."[33]

This statement succinctly characterizes the program in issue. The program merely establishes the mechanics through which the SBA has implemented its interpretation of the declared policy of the Small Business Act. Therefore, due to the type of program in question, the SBA was not obligated to give the Plaintiffs either formal notice or a hearing.[34]

IV. THE SET-ASIDE PROGRAM IS NOT MAJOR FEDERAL ACTION SIGNIFICANTLY AFFECTING THE ENVIRONMENT SO AS TO REQUIRE AN ENVIRONMENTAL IMPACT STATEMENT UNDER NEPA 42 U.S.C. § 4321 et seq.

 On November 7, 1973 the Court permitted the Plaintiffs to amend their complaint to include a violation of the National Environmental Policy Act of 1969 (NEPA).[35] 42 U.S.C. § 4321 et

---

**29.** On June 1, 1971 Plaintiffs' counsel submitted a 76 page memorandum in opposition to the then proposed timber set-aside agreement.

**30.** See *VanArsdale Deposition* at 74.

**31.** See Attorney General's Manual on the Administrative Procedure Act, p. 27 (1947) defining public property under the Section 4 exemption:

"Public Property. This embraces rules issued by any agency with respect to real or personal property owned by the United States or by any agency of the United States. Thus, the making of rules relating to the public domain, i. e., the sale or lease of public lands or of mineral, timber or grazing rights in such lands, is exempt from the requirements of Section 4".

**32.** Senate Comm. on the Judiciary, Administrative Procedure Act, S.Rep.No.752, 79th Cong., 1st Sess. 199 (1945). See also in The Congressional Record, the proceedings in the House of Representatives regarding the APA on May 24, 1946.

**33.** S.Rep.No.752, 79th Cong., 1st Sess. 199 (1945).

**34.** Subsequent to the adoption of this program, the SBA has waived its exemption under § 553(a). The 1971 set-aside program was adopted August 19, 1971 and the official agreement was signed December 29, 1971. The SBA published its notice of waiver on August 25, 1971. 36 Fed.Reg. 16716–17.

**35.** Whether the Plaintiffs have standing to raise the NEPA issues has been the cause of considerable discussion in the parties' papers. The crux of the discussion is whether the Plaintiffs' primary concern with protecting their economic interests rather than tangential environmental interests precludes them from raising the issue. Zlotnick v. Land Development Agency, 2 E.L.R. 20235 (No. 1700-71, D.D.C. March 3, 1972); Clinton Community Hospital v. Southern Mary-

seq. The Plaintiffs contend that the set-aside program is a major federal action [36] which "may" have damaging impacts upon the environment in that it may cause the waste of timber resources and possible air and water pollution.[37] Therefore, the Plaintiffs maintain, the Defendants have violated NEPA in failing to file an environmental impact statement as required by Section 4332(C).

NEPA requires each federal agency to file an environmental impact statement if it determines a contemplated program constitutes a major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). Each agency, then, must make the initial determination regarding the size and effect of the contemplated program upon the environment. The Forest Service decided the set-aside program was not a major federal action affecting the quality of the environment, and, therefore, did not require an environmental impact statement. They did not, however, articulate the reasons for this conclusion until two years after the implementation of the program.[38]

■■■■ The Court is now presented with the question of whether the agency's threshold decision was arbitrary, capricious or otherwise clearly erroneous. In its review of the agency's decision, the Court is obligated to consider the substantive decision on the merits to see if it is in accord with NEPA's requirements. E. g., Environmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972); Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, 470 F.2d 289 (8th Cir. 1972); Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971); Mowry v. Central Electric Power, 5 E.R.C.1978 (D.S.C. Nos. 72–1469 and 73–35, August 1, 1973). The Court's review, however, is a limited one for the purpose of determining whether the agency reached its decision after full, good faith consideration of the environmental factors under the standards set forth in §§ 101 and 102 of NEPA; and whether the actual

---

land Medical Center, 374 F.Supp. 450 (D. Md.1974); Pizitz v. Volpe, 2 E.L.R. 20378 (No. 3595–N, M.D.Ala. May 1, 1972). No group has a monopoly on advancing the public good. Therefore, any plaintiff who can "arguably" meet the Ballerina Pen standard, *supra*, cannot be denied the right to challenge agency non-compliance with NEPA. The Plaintiffs have alleged an injury in fact, namely, damage to the environment in which they work and upon which they depend for their livelihood and continued maintenance of the quality of their lives. This interest is arguably within the zone of interest sought to be protected by this intentionally broad protective statute.

36. The terms "major federal action" within the meaning of the statute, has an exceptionally broad meaning reflecting the law's intention "to promote an across-the-board adjustment in federal agency decision making so as to make the quality of the environment a concern of every federal agency." Scientists' Inst. for Public Info., Inc. v. A. E.C., 156 U.S.App.D.C. 395, 404, 481 F.2d 1079, 1088 (1973); (see reference to legislative history and judicial interpretations therein). Hanly I applies an objective standard to distinguish between a major and minor federal action such as: cost of the proj-

ect, the amount of planning preceding it, the time required to complete it, etc. Hanly v. Mitchell, 460 F.2d 640, 644 (2d Cir. 1972) (Hanly I).

37. The specific impact which the Plaintiffs claim is under-utilization of our natural resources. The Plaintiffs' thesis is that larger companies are more capable of using the timber to its full potential because they are better integrated and have financial resources to procure expensive, technologically advanced equipment to achieve the greater integration. The Plaintiffs see any limitation on small business' resale of set-aside timber to large companies as underscoring the under-utilization syndrome.

The Plaintiffs support their argument that small concerns contribute to greater air and water pollution by citing several bills which would have assisted small operations financially to meet new pollution regulation requirements.

38. On February 5, 1974, the Defendants filed, as a supplemental answer to the Plaintiffs' Interrogatories, an 18 page "Environmental Analysis Report" which sets out the Forest Service's reasons for concluding that this federal action did not require an environmental impact statement.

balance of costs and benefits struck by the agency according to these standards was arbitrary or clearly gave insufficient weight to environmental factors. E.D.F. v. Froehlke, *supra* 473 F.2d at 353.

■ The Forest Service's environmental report has analyzed each factor the agency is required to examine in drafting an impact statement. See *Forest Service Manual*, Section 8411. The Court has considered both this report and the Plaintiffs' lengthy analysis of the environmental factors and is compelled to conclude that the 1971 set-aside program is neither a major federal action nor one that significantly affects the quality of the human environment. The agency's decision gave good faith consideration to the environmental factors and came to a reasonable conclusion. The 1971 set-aside program is merely a technical change in the earlier set-aside program. It does not change either the manner or volume of timber harvested each year. Nor does it suspend the Forest Service's strict environmental and harvesting regulations for any bidder, large or small. The program simply guarantees small concerns a continued opportunity to bid on the national forests. The question is not whether the tree will fall, but who will fell it.

## V. THE SET-ASIDE PROGRAM DOES NOT VIOLATE THE FIFTH AMENDMENT AND OTHER FEDERAL STATUTES

As final points, the Plaintiffs contend that the timber set-aside program violates the Fifth Amendment, the Employment Act of 1946, the Economic Stabilization Act Amendments of 1971 and certain statutory provisions relating to the administration of the national forests. The Court also finds these objections to be without merit.

■ Examining first the Plaintiffs' charge regarding a violation of the Fifth Amendment, the Court finds the Plaintiffs have not been deprived of property without just compensation. The Plaintiffs have no vested proprietary right in the government's contracts or property. Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 184, 334 F.2d 570, 574 (1964). The "right" the Plaintiffs do have under the Fifth Amendment is the right to due process. This means that in the event of arbitrary, capricious or illegal administrative action affecting one's opportunity *to bid* on the contracts or property, the party who can show an injury due to allegedly illegal action can bring a suit to set it aside. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859 (1970). In the instant case, the Court has found that the SBA administrator acted within the bounds of his statutory authority and has devised this program to implement his statutory duty with the Plaintiffs' full participation.

■ As to the other federal statutes the set-aside program is alleged to have violated, suffice it to say that the Plaintiffs' allegations have no basis in fact, have no basis in law or are not relevant. Despite the two and one-half years the program has been in operation, the Plaintiffs have been unable to produce any evidence that the program defeats the policies of maximum employment or maximum economic productivity as declared in the Employment Act of 1946, 15 U.S.C. § 1021, and the Economic Stabilization Act Amendments of 1971, 15 U.S.C. § 1026(a), respectively. To the contrary, the timber set-aside program appears quite consistent with these national policies in that it is part of the aid to small business which Congress has declared will preserve the freedom of competition basic to the economic well-being and security of this country.[40]

Nor has the Plaintiff been able to offer any proof of violations of the statutes governing the administration of the national forests. The statutes which the

---

39. Furthermore, employment in this industry is determined by the demand for timber and

the volume of logs cut, and not by the size of the concern who does the logging.

Plaintiffs claim have been violated are irrelevant to the establishment of timber set-aside sales. Instead, they pertain to forest technology and agriculture.[40] In any event, there has been no showing, other than Plaintiffs' allegations, that the set-aside program contradicts the general, overall purpose of these statutes —the efficient administration and management of the national forests. The program does not increase the volume of timber harvested. Nor does it relieve any timber bidder from complying with the environmental and harvesting regulations imposed by each contract irrespective of the size of the bidder.

## VI. CONCLUSION

At the expense of being repetitive, the Court finds the 1971 set-aside program pertains solely to the opportunity to submit *bids* on a certain percentage of national forest timber *when*, and only when, the timber purchases of small forest products manufacturers has declined more than ten per cent of their historic share of the timber market. The program is small business' bulwark against their shut out from bidding on government timber. It does not reduce large business' historical share of the timber market nor does it increase that of small concerns. It does not increase the volume of logs cut, nor does it cast past harvesting and environmental regulations to the wind. The Defendants have acted within the scope of their authority and have developed, with the Plaintiffs' assistance, a reasonable program to effectuate the Defendants' statutory responsibilities. Since the program is reasonable in substance and in its adoption, the Court will pay due deference to the agencies' expertise in this area. Thus, for the reasons stated above, the Court will grant the Defendants' Motion for Summary Judgment and deny the Plaintiffs' Motion for Summary Judgment. An Order of even date will be entered in accordance with this Opinion.

40. The Plaintiff cites sections which (1) directs the administration of the national forests shall be toward the goal of water control and a continuous timber supply, 16 U. S.C. 475; (2) authorizes the sale of dead, matured or large growth trees, providing it is for the appraised value, to preserve younger growth, 16 U.S.C. 476. The sale of timber to small concerns cannot be at less than the appraised value, 36 C.F.R. 221.7 and 221.8; (3) Sections 16 U.S.C. §§ 528–531 is to supplement the purposes for which the national forests were established as set out in § 475, by adding that the national forests are established and administered for outdoor recreation, range, timber, watershed and wildlife and fish purposes, and that the Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom; and in effectuation of these sections the Secretary is to cooperate with state and local governmental agencies; (4) the Secretary of Agriculture is authorized to conduct technical agricultural experiments and tests, whether alone or in conjunction with private individuals or public agencies which he deems necessary to foster the growth and development of the national forests, 16 U.S.C. 581; (5) recognizes the relationship between the advances in forest technology and forest research efforts conducted by state colleges and universities and the federal government and the realization of full effectiveness if these efforts are conducted in close cooperation, 16 U.S.C. § 582a; and (6) severally authorize the Secretaries of Agriculture and Interior to establish by formal declaration, when in their discretion such action would be in the public interest, cooperative agreements with private landholders for the purpose of developing "cooperative sustained-yield units." 16 U.S.C. 583; (7) authorizes the Secretary of Agriculture to direct all activities with relation to the prevention of soil erosion including surveys and investigations, and various preventive measures, to cooperate with other agencies and persons as he deems necessary and acquire lands whenever necessary for the purposes of the Act, 16 U.S.C. § 590a; (8) declares as national policy that the U. S. government independently and through cooperation with other state and local governments and private timber owners to prevent outbreaks of destructive insects and diseases threatening all forest lands, 16 U.S.C. § 594–1; (9) authorizes the Secretary of Agriculture to cooperate with other agencies as he deems necessary to erradicate white-pine blister rust; to appropriate matching funds for such blister control if on non-federal property; and requires that any blister control program on Indian territory be subject to approval of the agency or Indian tribe with jurisdiction over such lands.