**LOUISIANA–PACIFIC CORPORATION,**
**Plaintiff-Appellant,**

v.

**John R. BLOCK, Secretary of Agriculture,\* et al., Defendants-Appellees.**

**No. 80–4319.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 15, 1981.

Decided Dec. 21, 1982.

\* Pursuant to Rule 43(c)(1) of the Federal Rules of Appellate Procedure, John R. Block has been substituted for Robert S. Bergland as the defendant.

Paul R. Haerle, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for plaintiff-appellant.

Paul E. Locke, Asst. U.S. Atty., Earl P. Dolven, San Francisco, Cal., Anne S. Almy, Washington, D.C., on brief.

Robert D. Clark, Washington, D.C., argued, for defendants-appellees.

Before CHOY and HUG, Circuit Judges, and GRAY,** District Judge.

CHOY, Circuit Judge:

Louisiana-Pacific Corporation (Louisiana-Pacific) appeals from the denial of its prayer for declaratory and injunctive relief to prohibit the U.S. Forest Service (Forest Service) from continuing to set aside certain sales of timber in Mendocino National Forest (Mendocino) to small businesses. Because the Forest Service's administrative decisions complied with the procedures mandated by law, were based upon consideration of the relevant factors and law, and did not constitute an abuse of discretion, we affirm.

## I.  Background

### A.  The Set-Aside Program

In 1971, because of decreasing purchases of federally owned timber by small businesses and in order to fulfill their mutual responsibilities under the Small Business Act (the Act), 15 U.S.C. §§ 631–647, the Forest Service and the Small Business Administration (SBA) entered into an agreement establishing the small business set-aside program. The program is essentially designed to ensure that small businesses

receive a "fair proportion" of the total sales of national forest timber as mandated by the Act. See 15 U.S.C. § 644(a)(4) (requiring that a fair proportion of total sales of government property be made to small business concerns).

Under the program, every five years the Forest Service determines the "fair proportion" for each national forest by reference to the percentage of timber actually purchased from that forest by small businesses in the previous five years. Deviations from that purchase history are allowed only in unusual circumstances. This small business proportion is called the "base average share." Although this share may be increased or reduced every five years to reflect recent purchase history, it may never be reduced to less than 50 percent of the initial (1971) base share. Thus, the base average share has a floor below which it cannot drop, but no ceiling.

Every six months, the Forest Service reviews the timber purchases in each national forest. If the accumulated small business purchases are 90 percent or less of the base average share, a set-aside sale is triggered. At the sale, timber equaling the amount of the deficiency is offered for bidding. The Forest Service and SBA officials may decline, due to unusual circumstances or in the public interest, to hold a set-aside sale even when one would normally be mathematically triggered. At the set-aside sale, only small businesses may purchase timber. Purchases at set-aside sales must be at a price not less than the appraised value of the timber. Any unsold set-aside timber is then made available to other purchasers.

Should small business purchases in a five-year period exceed or fall short of the base-period allocation, the Forest Service may, depending upon the size of the difference and in the proper circumstances, carry forward the surplus or deficit respectively into the subsequent period. This carry-forward has the effect of moderating the rate of increase or decrease of the base average

---

** The Honorable William P. Gray, Senior United States District Judge for the Central District of California, sitting by designation.

share. For example, if a surplus were carried forward, a set-aside sale would not be triggered until the deficiency in the next period exceeds the surplus carried forward from the previous one.

This set-aside program has been upheld as within the statutory authority of the Act and as having been established in a rational manner after full consideration of all of the relevant factors. *See Duke City Lumber Co. v. Butz*, 382 F.Supp. 362, 370–72 (D.D.C. 1974), *aff'd in pertinent part*, 539 F.2d 220 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Louisiana-Pacific does not challenge the validity of these aspects of the program. Rather, Louisiana-Pacific attacks: (1) the set-aside program *as applied* in Mendocino; and (2) an alleged modification in the Manual governing the program.

### B. *Application of the Program*

During the 1971–75 period and entirely in open bidding, small businesses purchased 24 percent of the timber offered in Mendocino, an amount 14 percentage points higher than the 10 percent base set in 1971 by the Forest Service. At the end of the 1971–75 period, the Forest Service Supervisor for Mendocino followed the recomputation rules to set the base average share at 24 percent for the 1976–80 period. Louisiana-Pacific filed an administrative appeal protesting in part that the Forest Service rules were causing continual and virtually automatic increases in the Mendocino base average share. The Forest Service refused to reduce the share.

Also at the end of the 1971–75 period, local Forest Service and SBA employees began deliberations about whether to carry forward the "surplus," i.e., the 50 million board-feet difference between the 10-percent estimated level of purchases and the 24-percent actual. The Forest Service Manual provides that surpluses or deficits of 5 percent or less are to be carried over entirely to the next five-year period. If, however, the change in the small business share exceeds five percentage points, the Forest Supervisor can drop it or carry it over in whole or in part, depending upon the local

circumstances that justify the decision. In the event of a decision to drop the surplus in whole or in part, the Manual requires solicitation of industry comments. Using these standards and procedures, the local Forest Service and SBA employees decided to carry forward the Mendocino surplus for only the first nine months of the 1976–80 period and issued a joint communique on May 25, 1976, describing the partial carry-forward. In its comments on the proposed share, Louisiana-Pacific requested administrative review of the decision to drop the surplus after the nine-month period. The request was denied as premature. On September 13, 1976, the nine-month carry-forward decision was formally announced.

Apparently to eliminate the inconsistent and sometimes politically based decisions about whether to carry forward surpluses and to assure that the small business set-aside program would adhere to purchase history, the SBA and the Forest Service met on September 14, 1976. In a "limited distribution" memorandum dated October 15, 1976 (October memorandum), the Forest Service announced that they and the SBA had agreed to an interpretation of the section of the Manual addressing the treatment of surpluses or deficits in excess of 5 percent. That interpretation meant that surpluses or deficits exceeding 5 percent were to be dropped totally unless extraordinary circumstances existed to justify a deviation. The Forest Service sent the memorandum to all Regional Foresters, but made no public announcement of the memorandum or of its contents.

On November 8, 1976, Louisiana-Pacific again requested administrative review of the Forest Service decision to drop the surplus in Mendocino. On March 25, 1977, the Regional Forester denied Louisiana-Pacific's request for a full carry-forward and upheld the partial carry-forward under the extraordinary-circumstances test set out in the October memorandum. This is apparently when Louisiana-Pacific learned of the existence of the October memorandum. Louisiana-Pacific appealed from the denial and on August 12, 1977, the Chief of the Forest Service denied the request for a full carry-forward and, basing his decision on

the extraordinary-circumstances test announced in the October memorandum, reversed the decision to partially carry forward the surplus. Having exhausted its administrative remedies, Louisiana-Pacific then filed suit for declaratory and injunctive relief because the set-aside program and the administrative decisions under it had reduced the quantity of Mendocino timber available for purchase by Louisiana-Pacific. At the conclusion of a four-day bench trial, the district court upheld the program as applied in Mendocino.

On appeal, Louisiana-Pacific contends primarily that the Forest Service violated the Administrative Procedure Act (APA) when it promulgated the October memorandum allegedly containing a new general policy concerning when to carry forward surplus timber purchases. Louisiana-Pacific also argues that the Forest Service acted arbitrarily and capriciously in setting the share of Mendocino timber designated for sale to small businesses and in refusing to carry forward the surplus purchases made by small businesses from Mendocino in the 1971–75 period.

II. *The October Memorandum*

■ The Forest Service Manual provides that surpluses or deficits "may be dropped or carried over totally or in part depending on local circumstances that justify the decision." The October memorandum limits that ambiguous grant of discretion such that "unless extraordinary circumstances exist to justify deviation, surpluses . . . exceeding . . . 5 percent will be totally dropped." Louisiana-Pacific contends that the October memorandum should be characterized as a legislative rule because it reversed a presumption in the Manual that all surpluses regardless of size would be carried over.[1] If the memorandum is a legislative rule, there is no doubt that it is invalid for not having been promulgated in accordance with the formal rulemaking procedures of the APA, 5 U.S.C. § 553. The notice and comment requirements of § 553, however, do not apply to interpretative rules. *Stoddard Lumber Co. v. Marshall*, 627 F.2d 984, 987 (9th Cir.1980); *Boating Industry Associations v. Marshall*, 601 F.2d 1376, 1382 n. 6 (9th Cir.1979); 5 U.S.C. § 553(b)(3)(A).

■ To determine whether the memorandum is a legislative or interpretative rule, we must decide whether in issuing the memorandum the Director of Timber Management[2] was exercising or intending to

---

**1.** Louisiana-Pacific argues that the Manual creates a presumption in favor of carrying over surpluses and deficits in excess of 5 percent by providing that a decision not to carry forward the entire surplus or deficit requires specific procedures. Moreover, the Manual's statement that when "such a change" is proposed comments must be solicited from industry shows that the Manual anticipates that an entire surplus will normally be carried over, according to Louisiana-Pacific. This is not an unreasonable reading of the sentences. Because of the ambiguity of the language, however, this portion of the Manual must also be read in the context of the entire set-aside program. Section 4c of the SBA–Forest Service agreement to create a set-aside program and §§ 2431.15b–3 and 2431.-17–1 of the Manual all show that purchase history is the basis of the program and that deviations from it should occur only due to unusual considerations such as past long-term sales and large salvage sales. Thus, the local circumstances language, when read in the context of the entire program, can also be reasonably construed as in the October memorandum.

We reject the Government's contention that the characterization of the memorandum is moot. If the memorandum was issued invalidly, it may be that the set-aside sales were also invalid and should not have been used in setting the new base share.

**2.** Louisiana-Pacific's argument that the Director of Timber Management was not authorized by the Manual to issue the October memorandum is without merit. The Director is senior to the Forest Service personnel authorized in the Manual and it seems reasonable that an authoritative, agency-wide interpretation would be made by more senior agency officials. Both *United States v. Nixon*, 418 U.S. 683 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973), and *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), are inapposite because they concern attempted executive interference with judicial or quasi-judicial proceedings.

exercise a delegated legislative power to make law. *See Stoddard Lumber,* 627 F.2d at 987 (*quoting* 2 K. Davis, *Administrative Law Treatise,* § 7:8 at 36 (2d ed.1979)). This determination is complicated here by the fact that the Forest Service had the authority to promulgate both legislative and interpretative rules concerning surpluses.

■ When an agency ruling specifically provides a source of authority for promulgation, the determination that the ruling is legislative is simplified. Because no authority is provided in the October memorandum for its issuance, we must look for other indications of the Forest Service's intent. In the memorandum, the Director used the word "interpretation" when discussing the decision. The label that agency personnel choose for describing an agency's action, however, is only indicative, and not dispositive, of the agency's intent. *See Chamber of Commerce of the United States v. OSHA,* 636 F.2d 464, 468 (D.C.Cir.1980).

■ At trial, the Government elicited considerable testimony that, in issuing the October memorandum, the Forest Service intended to clarify but not to alter the set-aside program. While such evidence would be persuasive had it been presented at the time the interpretation was issued, it is entitled, at most, to very limited weight because it constitutes *post hoc* rationalization for the Forest Service's action. *See, e.g., Columbus & Southern Ohio Electric Co. v. Costle,* 638 F.2d 910, 912 (6th Cir.1980) (judicial rule bars consideration of *post hoc* rationales for informal rulemaking); *Tabor v. Joint Board for Enrollment of Actuaries,* 566 F.2d 705, 709–10 (D.C.Cir.1977) (agency rulemaking not sustainable on *post hoc* rationalizations supplied during judicial review).

■ A court may infer intent from the foreseeable effect that the rule will have. *Chamber of Commerce,* 636 F.2d at 469 & n. 7. *See Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1199, 86 L.Ed. 1563 (1942) (substance of what an agency has purported to do and what it has done is decisive in characterizing rule). It is undisputed that the memorandum was designed to and foreseeably would limit the discretion that local supervisors had concerning whether to carry forward the surpluses and deficits. It is also not disputed that the memorandum was needed in order to stop the selective, and sometimes political, application that had been occurring in this part of the program. The inference from these intended and foreseeable effects supports the argument that the Forest Service issued the memorandum to provide an interpretation to be applied consistently and not to change the carry-forward provisions.

More importantly, we agree with the district court's conclusion that Louisiana-Pacific has failed to establish sufficient reason for characterizing the issuance of the memorandum as legislative rulemaking. Because the memorandum was not issued pursuant to a legislatively delegated power to make rules having the effect of law and was not intended to be more than the Forest Service's interpretation of a portion of the set-aside program, we conclude that the memorandum was an interpretative rule exempt from the formal requirements of the APA.

■ Louisiana-Pacific contends that notice and an opportunity to comment should nonetheless be required under common law fairness requirements because the October memorandum had a "substantial impact" on a segment of the public. We have previously discussed the substantial-impact doctrine, and its possible vitiation by the Supreme Court's decision in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), that courts should avoid imposing procedural requirements beyond those of § 553. *See Stoddard Lumber,* 627 F.2d at 987. We need not decide here whether to adopt the doctrine or whether the doctrine has been vitiated, however, because we are convinced that the memorandum did not have a sufficiently substantial impact either in Mendocino or nationally to require common law notice and comment procedures.

While Louisiana-Pacific has shown that the memorandum generated some controversy, the only possible "impact" on Mendocino that we discern here is that the memorandum *may* have had some effect on the Forest Service's reversal of the nine-month carry-forward of the surplus recommended by local officials. But even that appears doubtful. In fact, the Forest Service supervisor upheld the partial carry-forward on the basis of the October memorandum.

Louisiana-Pacific contends that the October memorandum had a substantial impact because it reversed a presumption in the Manual in favor of carrying forward surpluses and deficits. As we have discussed at footnote 1, *supra,* at 1209, however, neither Louisiana-Pacific's nor the Forest Service's reading of the Manual is unreasonable. Because we conclude later in this opinion that substantial deference should be given to the Forest Service's reading, we do not think that the memorandum had a substantial impact on the administration of the set-aside program.

## III. *The Mendocino Base Average Share*

Louisiana-Pacific contends that the base average share recomputation rules are invalid as applied in Mendocino because they have enabled small business to obtain, and guarantee that small business will continue to obtain, an increasing amount of timber in excess of the "fair proportion" specified in the Act. Louisiana-Pacific also argues that the Forest Service failed to consider the adverse effect on large businesses and competition and the absence of small business need for governmental guarantees in setting the base share.

Because Louisiana-Pacific seeks injunctive and declaratory relief from this court, it is particularly important that we be convinced that the controversy is ripe for adjudication. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *International Society for Krishna Consciousness, Inc. v. Kleppe,* 592 F.2d 529, 532 (9th Cir.1979). In determining ripeness, we focus on the fitness of the issues for judicial resolution and the hardship to the parties of withholding court consideration. *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515; *Pence v. Andrus,* 586 F.2d 733, 737 (9th Cir.1978). Under this standard, we have no doubt that the question of whether the 24-percent share is in excess of small business' fair share for Mendocino is ripe for adjudication.

Whether the program *will* result in an unfair proportion for small business, however, is not ripe. The Forest Service's actions concerning the future application of the program are subject to change and thus not final. Moreover, courts are not equipped to make the type of speculations that serve as a basis for the issues involved here. Finally, because the future base share is uncertain, we see no hardship on the parties resulting from our withholding consideration of this issue.

That a question is ripe for adjudication, however, does not necessarily mean that it is a proper one for adjudication. A strong argument can be made that the determination of what share is a fair proportion under the Act is entirely up to Congress and the administering agencies, and not the courts. We need not decide that difficult question, however, because, even if we may properly determine what is a fair proportion, we cannot say that the evidence shows that a 24-percent share is in excess of the fair proportion to which small business is entitled.

No relevant case or legislative history is cited in support of the allegation that the Forest Service abused its discretion by setting a 24-percent share. The Act specifically provides that small businesses may be awarded *any* contract for the sale of government property which the SBA and the contracting agency have determined to be in the interest of assuring that small business obtains a fair proportion of the total sales. *See* 15 U.S.C. § 644. And the Act further provides that the *agencies* may determine who is entitled to obtain a fair proportion. *Id.* In the face of such a broad delegation of power under the Act, and in

the absence of any contrary compelling evidence, we cannot say that the Forest Service abused its discretion in setting the small-business share at 24 percent.

■ Nor do we believe that the Forest Service acted in an arbitrary and capricious manner by not expressly considering small-business needs or the adverse effect of the base-share decision on large business and on competition. While an agency's decision must be based on consideration of the relevant factors, *Washington State Farm Bureau v. Marshall,* 625 F.2d 296, 302 (9th Cir.1980), Louisiana-Pacific has failed to show that either of these two considerations is a relevant factor required to be considered under the Act.[3] In fact, Louisiana-Pacific has cited nothing in the legislative history of 15 U.S.C. § 644 even suggesting that the interests of large business or the needs of small business should be taken into consideration in determining the small business "fair proportion."

## IV. *The Small-Business Surplus*

On the basis of the October memorandum, the Forest Service decided not to carry forward the 1971–75 small-business surplus in Mendocino to the 1976–80 program. Louisiana-Pacific essentially argues that the Forest Service's decision was arbitrary and capricious.[4] The Government replies that the controversy is moot because the effect of the decision was primarily felt in the 1976–80 period.

■ Although much of the effect of the decision was felt in the previous period, this controversy is not moot. Because the surplus was not carried over, the Forest Service apparently offered some 35 million board-feet of timber at set-aside sales designed to affect the small-business share for the period. Had the surplus been carried over for the entire period, none of these sales would have been triggered. With the previous-period purchase history of small business serving as the focus of the base share for the next period, the decision undoubtedly affected, as it was designed to, the new base share for the 1981–85 period.

■ In reviewing an interpretative rule, we are "free to substitute [our] own judgment on the validity of the rule in the light of the statute and the regulations." *Good Samaritan Hospital v. Mathews,* 609 F.2d 949, 954 (9th Cir.1979). The weight we give to an interpretative rule varies from case to case and depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Good Samaritan Hospital,* 609 F.2d at 954 (*quoting Skidmore*).

Here, the Forest Service appears to have given fairly thorough consideration to the ruling: The agency met with the SBA to discuss the particular interpretation after it became apparent that problems had arisen. More importantly, the reasoning in the memorandum seems valid when viewed in the context of the entire set-aside program. The whole focus of the program is the purchase history of small business. The interpretation, that unless extraordinary circum-

---

**3.** One court has held that small-business need is not a factor that should be considered because it was established when Congress enacted the Act. *See Duke City Lumber Co. v. Butz,* 382 F.Supp. 362, 371 (D.D.C.1974), *aff'd in pertinent part,* 539 F.2d 220 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977).

**4.** Louisiana-Pacific also contends that, in deciding whether to carry forward the surplus, the Forest Service failed to consider the lack of need for increased government assistance to small business in Mendocino. While an administrative agency must consider all relevant factors, *see Nance v. Environmental Protection Agency,* 645 F.2d 701, 705 (9th Cir.), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981), Louisiana-Pacific has failed to show that the lack of small business need was a relevant factor. And it is not clear that need is a factor that must be considered. *See Duke City,* 382 F.Supp. at 371. Even assuming that it is, however, we are convinced that the Forest Service's consideration of the amount of timber under contract, of the planned timber sales, and of the local communities dependent on the timber supply served in this case as a satisfactory proxy for the lack of need.

stances exist, surpluses or deficits in excess of 5 percent are not to be carried over, preserves that focus.

The interpretation is consistent both with the Manual and with the central agreement between the SBA and the Forest Service to develop a set-aside program. Sections 2431.15b–3 and 2431.17–1 of the Manual state that the need to consider factors other than purchase history should be minimal although an allowance can be made for "unusual considerations." Section 4 of the agreement provides that recomputation of the base share is to be based on purchase history but that the Forest Service and the SBA may deviate from that history when "unusual considerations" arise. While the terms "extraordinary circumstances" and "unusual considerations" alone are not necessarily identical, their use in discussing the relationship between purchase history and proper base shares shows that they should be construed similarly.

In summary, on the basis of the *Skidmore* factors as applied in this case, we think that substantial deference should be given to the agency's interpretation. Consequently, the Forest Service's refusal to carry forward the 1976 small-business surplus in Mendocino was consistent with these regulations and was not arbitrary and capricious.

### V. Conclusion

Neither setting the 1976–80 small-business share of Mendocino timber at 24 percent nor dropping the 1971–75 small-business surplus was arbitrary, capricious, or an abuse of discretion. The October memorandum was an interpretative rule, not subject to APA rulemaking procedures or whatever common law fairness procedures that may exist. Our affirmance of the district court's entry of judgment for the Forest Service, however, should not be read as an endorsement of the program beyond what was presented to us in this case. We are concerned about the direction of the present SBA and Forest Service practices in Mendo-

cino.[5] We reserve for another day, however, the question of whether it is for the judiciary or for Congress to determine whether the small-business share exceeds the "fair proportion" under the Act and what a "fair proportion" might be.

AFFIRMED.

5. We note that the small-business base share in Mendocino has been set at 32 percent for the 1981–85 period.