In the Matter of Establishment Inspection of STODDARD LUMBER COMPANY, INC., ¼ Mile South of City of Yellowstone Highway, St. Anthony, Idaho, Petitioner-Appellant,

v.

Ray MARSHALL, Secretary of Labor, U.S. Department of Labor, Respondent-Appellee.

No. 79–4143.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 2, 1980.

Decided Sept. 15, 1980.

court's order on three grounds: (1) the district court erred in finding that the Secretary of Labor's inspection selection method was exempt from the notice and comment rulemaking procedures of the Administrative Procedure Act (APA) under 5 U.S.C. § 553; (2) the district court erred in finding that Stoddard fit within the standards outlined in the Secretary's inspection selection plan; and (3) the Secretary lacked the authority to apply *ex parte* for inspection warrants under 29 C.F.R. § 1903.4. We find no merit in appellant's challenges and affirm the contempt order.

Our jurisdiction rests on 28 U.S.C. §§ 1291 and 1294(1).

I.

## FACTUAL BACKGROUND

Stoddard Lumber Company is an Idaho corporation engaged in the business of producing lumber and other wood products for shipment to points both inside and outside the State of Idaho, and is thereby subject to the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651 et seq., [hereinafter referred to as "the Act"].[1] Since July 1, 1974, OSHA's Boise Area Office has utilized a detailed procedure for identifying and selecting particular work establishments for inspection pursuant to section 8(a) of the Act. Under OSHA's General Schedule Inspection Selection Process, OSHA inspections are divided into two categories: (1) unscheduled inspections, which are conducted in response to the receipt of information of hazardous working conditions at a particular establishment; and (2) general schedule inspections, which are scheduled on the basis of objective selection criteria.[2]

John L. Runft, Runft & Longeteig, Chartered, Boise, Idaho, on brief, for petitioner-appellant.

Charles Hadden, Carin A. Clauss, Benjamin W. Mintz, Allen H. Feldman and Thomas L. Holzman, Washington, D.C., on

Before SNEED and NELSON, Circuit Judges, and GRAY *, District Judge.

SNEED, Circuit Judge:

Appellant, Stoddard Lumber Company, appeals from an order of the district court holding the company in contempt of court for refusing, on November 29, 1978, to honor an Occupational Safety and Health Administration (OSHA) inspection warrant that was obtained *ex parte* on November 21, 1978. Stoddard challenges the district

---

* Honorable William P. Gray, United States District Judge for the Central District of California, sitting by designation.

1. Stoddard is engaged in business affecting commerce within the meaning of section 3 of the Act, 29 U.S.C. §§ 651 et seq., since it ships some of its products interstate.

2. Based upon data regarding accidents and illnesses, industries within Idaho are ranked in descending order on the basis of accidents and illnesses per employee. Industries with an ac-

cident/illness rate exceeding the national rate of 9.2 accidents or illnesses per 200,000 man-hours worked are classified as "high hazard" industries. At all relevant times, 32 industries in Idaho were listed as "high hazard." Within each "high hazard" industry, individual work establishments are ranked in descending order on the basis of injury/illness rates. The number of general schedule inspections that reasonably can be anticipated to be performed in a given year is estimated, and that number of individual work establishments is selected with a uniform percentage of establishments being

Utilizing this inspection selection procedure, Richard Jackson, OSHA Area Director for the State of Idaho, selected Stoddard for a general schedule inspection, and assigned an OSHA compliance and safety officer to conduct it. However, on September 26, 1978, when compliance officer Garney Coffey attempted to inspect the Stoddard workplace, the company refused him entry. Thereupon, the Secretary of Labor filed an application for an *ex parte* inspection warrant in the United States District Court for the District of Idaho. Based on the Secretary's warrant application and accompanying documents, the district court found sufficient probable cause to issue a warrant authorizing a full inspection of the Stoddard premises.

On November 29, 1978, an OSHA compliance officer returned to the Stoddard workplace and attempted to execute the warrant, but the company, after consulting with its attorney, again refused to permit the inspection. The Secretary then applied to the district court for an order holding Stoddard in contempt. The district court issued an order directing Stoddard to show cause why it should not be held in contempt. After a hearing held on the show cause order, the court entered an order holding the company in contempt for its refusal to honor the OSHA inspection warrant. The court fined Stoddard $500 plus an additional $100 for each succeeding refusal to permit an inspection.[3]

Stoddard contends that the warrant was invalid because it was issued pursuant to an OSHA regulation which was not promulgated in accordance with the APA notice and comment rulemaking procedures under 5 U.S.C. § 553. Alternatively, appellant argues that the warrant was invalid because it lacked an adequate showing of probable cause, and because it had been obtained *ex parte.*

## II.

## RULEMAKING PROCEDURES UNDER THE APA

The Act evidences a strong congressional policy that every worker in the United States should be afforded a safe working environment. 29 U.S.C. § 651(b). To that end, the Secretary of Labor is invested with limited authority to enter and inspect workplaces for occupational hazard "during regular working hours and at reasonable times . . . within reasonable limits and in a reasonable manner . . . ." 29 U.S.C. § 657(a)(2). The Secretary is also given authority to "prescribe such rules and regulations as he may deem necessary to carry out [his] responsibilities under this chapter, including rules and regulations dealing with the inspection of an employer's establishment." 29 U.S.C. § 657(g)(2).

Stoddard contends that the Secretary's General Schedule Inspection Selection Process is *per se* unreasonable because it is a "rule"[4] that has not been promulgated in

taken from the top of each "high hazard" industry.

The "high hazard" individual work establishments are grouped on a geographical basis. Idaho is divided into four districts. Within each district, the individual work establishments are grouped by county location. Each county receives approximately the same proportion of total inspections as the county's proportion of the total working population of Idaho. Finally, within a selected county the largest employer on each of the high hazard lists is chosen. Thus, the largest employer on the highest hazard industry in the county is selected first, followed by the largest employer of the second highest hazard industry in the county and so on until the number of anticipated inspections is completed. *See* General Schedule Inspection Selection Process, C.R. 6.

3. The company was advised by the order that the fine would be set aside if it notified the court the inspection would be permitted by February 14, 1979, and would in any case be suspended if the company advised the court by that date that it was proceeding with an appeal.

4. The APA defines a "rule" as follows:

(4) "rule" means the whole or a part of an *agency statement of general or particular applicability and future effect* designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing. . . . 5 U.S.C. § 551(4).

accordance with the formal rulemaking procedures of 5 U.S.C. § 553. Section 553 requires publication of an agency's rules in the Federal Register at least thirty days before its effective date, and that persons subject to an agency's rules be given notice of and an opportunity to comment on proposed rules. However, by its own terms, the notice and comment requirements of 5 U.S.C. § 553 do not apply "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice . . . ." 5 U.S.C. § 553(b)(3)(A).

Distinguishing between those types of rules which to be valid must be promulgated pursuant to the procedures of section 553 and others whose validity does not rest on observance of that section's notice and comment procedures has proved to be quite difficult. A few quite simple and universally accepted propositions can be stated, however. Legislative rules must be promulgated pursuant to section 553. Interpretative rules and other types of declarations described in section 553(b)(3)(A) frequently, but not invariably, need not be. The fundamental distinction between legislative rules and interpretative rules has been described by Professor Davis in the following manner:

> "A legislative rule is the product of an exercise of delegated legislative power to make law through rules. An interpretative rule is any rule an agency issues without exercising delegated legislative power to make law through rules."

2 K. C. Davis, *Administrative Law Treatise*, § 7:8 (2d ed. 1979) [hereinafter cited as *Davis*]. Valid and properly promulgated legislative rules have the force of law; interpretative rules are subject to having their content rejected by a court. Even though an agency has the power to promulgate legislative rules, as the Secretary does in this case, it might choose not to issue rules pursuant to that authority. In such instances the rules are interpretative, not legislative. *Id.*

The preciseness of these propositions is greatly reduced by the fact that many courts have held that rules, even though intended by the agency to be interpretative, which have a "substantial impact" must nonetheless comply with the notice and comment procedure. *See National Motor Freight Traffic Ass'n v. United States*, 268 F.Supp. 90 (D.D.C. 1967), *aff'd* 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968); *Pharmaceutical Manufacturers Ass'n v. Finch*, 307 F.Supp. 858 (D.Del. 1970); *Davis*, § 7:17. The presence of "substantial impact" is indicated, it has been said, by "the amount of confusion and controversy generated and the need for expertise in resolving the issue, in addition to its financial impact on affected parties." *See* Warren, *The Notice Requirement In Administrative Rulemaking: An Analysis Of Legislative And Interpretive Rules*, 29 Adm.L.Rev. 367, 389 (1977). Courts applying the "substantial impact" analysis sometimes ignore the APA distinction between legislative and interpretative rules and simply distinguish between rules having a "substantial impact" which are subject to the notice and comment procedure and those not having such an impact which are not subject to such procedure. Professor Davis, while taking care to point out the juridical difference between legislative rules and interpretative rules, expresses approval of the exercise by the courts in appropriate cases of the power to require notice and comment procedures even though not specifically required to do so by the APA. *Davis*, § 7:18. In his view the Supreme Court's recent adjuration to avoid imposing procedural requirements beyond those of section 553, set forth in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), should not terminate this practice. *Davis*, § 7:19.

█ Be that as it may, we have no difficulty in holding that neither the General Schedule Inspection Selection Process, nor OSHA Instruction CPL 2.25, nor the 1979 OSHA Field Operations Manual and Industrial Hygiene Field Operations Manual,

Chap. IV, each of which is referred to by appellant in his brief, is subject to notice and comment procedure. None was promulgated as a legislative rule by the Secretary. Also none has a sufficiently "substantial impact" to justify such procedure. The program by which the choice of installations to inspect is made remains subject to control by the courts exercising their responsibilities under the criteria of the Fourth Amendment as explicated in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Although the ability of courts to substitute their judgment for that of an administrator will not in all instances excuse noncompliance with notice and comment procedure, in this case the experience of courts in determining the reasonableness of searches pursuant to warrants constitutes a source of expertise very likely not inferior to that of the Secretary. The absence of notice and comment procedures under these circumstances very likely will not prejudice owners. Our conclusion remains the same without regard to whether the Secretary's pronouncements be regarded as interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.

## III.

### APPLICATION OF THE STANDARDS TO STODDARD'S BUSINESS

In *Marshall v. Barlow's, Inc., supra*, the Supreme Court held section 8(a) of the Act unconstitutional insofar as it authorized nonconsensual warrantless inspections of an employer's establishment. The Supreme Court stated quite clearly that to obtain a warrant the Secretary is not required to show probable cause in the criminal law sense. Instead, the Court held that:

> [f]or purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'

435 U.S. at 320, 98 S.Ct. at 1824 [*citing Camara v. Municipal Court*, 387 U.S. 523, 538, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)].

Stoddard asserts that no probable cause was established since the Secretary made no showing to the magistrate that the selection program applied to Stoddard's lumber business. Specifically, according to Stoddard, the Secretary was required to provide statistics on the company's accident and illness rate, as well as show the company's position on the worst-first list in order to satisfy the probable cause standard under *Barlow's*.

We find that such a showing is not required. *See Marshall v. Chromalloy American Corp.*, 589 F.2d 1335 (7th Cir.), *cert. denied*, 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979). In *Chromalloy*, the Seventh Circuit found that a warrant application stating that there was a high incidence of injuries in the foundry industry had stated a basis for the magistrate's finding of probable cause. The court noted that to require individual statistics every time the Secretary wants a warrant would result in a full-blown hearing and "would be imposing on the Secretary an unwarranted 'consumption of enforcement energies' which would 'exceed manageable proportions. . . . Such a situation was not intended by the Supreme Court in its decision in *Barlow's*." 589 F.2d at 1342. (Citations omitted.)

In his application for a warrant, the Secretary provided the district court with the following information: (1) a detailed explanation of the selection plan; (2) the OSHA area director's sworn affidavit stating that Stoddard was selected pursuant to that plan without influence of any other factors; and (3) that the injury incident rate in the lumber industry was 1.8 times the national injury rate for 1976, the most recent year for which statistics were available. Given this information, it was clear that Stoddard fit within the selection program. Contrary to appellant's contention, the Secretary's failure to provide individual statistics of Stoddard's business does not

make the warrant fatally defective. There was sufficient evidence presented to support the district court's finding of probable cause for the issuance of the administrative search warrant.

## IV.

## AUTHORITY OF THE SECRETARY TO OBTAIN EX PARTE WARRANTS

Stoddard argues that 29 C.F.R. § 1903.4, both as originally promulgated and as amended, does not authorize the Secretary to apply for OSHA inspection warrants *ex parte*. Stoddard asserts that the *Barlow's* decision indicated that upon being refused permission to inspect, the Secretary is limited to seeking compulsory judicial process for inspections in which the owner of the installation is given notice to appear and show cause why inspection should not be permitted. Appellant relies principally upon the decision and reasoning of the court in *Cerro Metal Products v. Marshall*, 620 F.2d 964 (3d Cir. 1980). The Third Circuit, in affirming the district court's granting of a preliminary injunction prohibiting OSHA from obtaining *ex parte* warrants to inspect the employer's workplace, placed great weight, as had the district court, upon the Supreme Court's *dictum* in *Barlow's* that "the kind of process . . . apparently anticipated by . . . regulation [§ 1903.4] provides notice to the business operator." 436 U.S. at 318, 98 S.Ct. at 1823. Although recognizing that it was not bound by this *dictum*, the majority nonetheless adopted it as integral to the constitutional holding in *Barlow's* and concluded that section 1903.4 as originally promulgated "did not empower OSHA to seek *ex parte* warrants." *Cerro Metal Products v. Marshall*, supra at 979.

To evaluate properly the Third Circuit's position, it is necessary initially to make clear three propositions. The first is obvious. The Fourth Amendment does not preclude *ex parte* warrants. The second is that nothing in the Act requires notice to the employer before acquiring a warrant. Finally, the existing regulation, section 1903.4, as amended on December 22, 1978, contemplates the availability of *ex parte* warrants.

The circumstances upon which the Third Circuit relied arose from the Secretary's efforts in *Barlow's* to avoid the Fourth Amendment's warrant requirements. In that effort the Secretary took the position that a warrant was unnecessary because those who refused to permit inspection upon request were entitled to notice of compulsory process initiated by the Secretary. Participation in that process, the Secretary suggested, afforded sufficient protection to the employer, and its availability coupled with the absence of a warrant requirement would discourage employer resistance to inspections and facilitate administration of the Act. *See Cerro Metal Products v. Marshall, supra* at 976 n.32. The 1976 version of the Field Operations Manual was not inconsistent with this position. In that version the phrase "compulsory process" was substituted for the word "warrant," which appeared in the earlier 1972 version, and the following paragraph, which also appeared in the 1972 version, was eliminated:

> f. In cases where a refusal of entry is to be expected from the past performance of the employer, or where the employer has given some indication prior to the commencement of the investigation of his intention to bar entry or limit or interfere with the investigation, a warrant should be obtained before the inspection is attempted. Cases of this nature should also be referred through the Area Director to the appropriate Regional Solicitor and the Regional Administrator alerted.

As a result the Third Circuit concluded that neither the regulations nor the Secretary's practices thereunder recognized *ex parte* warrants and that any change of those regulations required a notice and comment rule making. It added elegance to its holding by invoking Shakespeare's line from Hamlet that the agency was "hoist with [its] own petar." *Cerro Metal Products v. Marshall, supra* at 967. The issue in this case is

whether there was a "petar" with which to be "hoist." We think not.

It is indeed true that the Secretary perhaps unwisely altered its manual to reflect his belief that the Fourth Amendment imposed no warrant requirement with respect to nonconsensual inspections. "Compulsory process," a conveniently ambiguous term, was introduced to indicate primarily that coercion would be applied to those who resisted inspection. We cannot agree, however, that the term must be construed as a forswearing by the Secretary of any intention or power to resort to the *ex parte* warrant process. We are persuaded by Chief Judge Seitz's dissenting opinion in *Cerro Metal Products, Inc., supra* at 984, in which he pointed out that the 1976 Manual retained in its subparagraph (8) the phrase that "[e]xcept in unusual circumstances . . ., there shall be no advance notice to the employer concerning compulsory process or pending inspection." The forerunner of this phrase appeared in the 1972 Manual and read:

> "Except in unusual circumstances . ., there shall be no advance warning to the employer of the fact either that a warrant has been secured or that inspection will take place pursuant to the warrant."

It is clear, asserted Chief Judge Seitz, that the term "compulsory process" in subparagraph (8) of the 1976 Manual refers to the use of *ex parte* warrants as did its predecessor in the Manual's 1972 version. We agree.

Nor is this reading of the 1976 Manual foreclosed by the Supreme Court's opinion in *Barlow's.* In broad terms, the Court took the position that the Fourth Amendment's warrant requirement as applied to inspections under the Act was not significantly more burdensome than was the procedure then employed by the Secretary with respect to those who refused to consent to inspections. 436 U.S. at 316–21, 98 S.Ct. at 1822–25. Moreover, the Court recognized that "surprise searches" were authorized by the Act and "contemplated" by the regulations. *Id.* at 317, 98 S.Ct. at 1823. Such searches obviously would employ the *ex*

*parte* warrant procedure. Against this interpretation must be placed the Court's footnotes 14 and 15 in which the focus is on a "compulsory process" in which notice is given to the owner who refused to permit inspection of the initiation of that "process." In addition, footnote 15 can be read as assuming that no *ex parte* warrant procedure was authorized by the regulations. We believe, however, that to hold that these two footnotes amount to a determination by the Supreme Court that the regulations did not authorize *ex parte* warrants accords them undue weight. In truth the Court never specifically focused its attention on whether *ex parte* warrants were authorized. It merely addressed the "compulsory process" that the Secretary indicated he was using, and which did not involve the use of a warrant, and concluded that it provided no reason to set aside the Fourth Amendment's warrant requirement. We decline to read more into the opinion because of two footnotes.

We conclude by observing that this court has held that OSHA administrative searches pursuant to a warrant are authorized by the statute and the regulations. *See Plum Creek Lumber Co. v. Hutton,* 608 F.2d 1283, 1287 (9th Cir. 1979); *see also Marshall v. Burlington Northern, Inc.,* 595 F.2d 511, 514 (9th Cir. 1979). In *Plum Creek,* as here, the inspection warrant was obtained before the 1978 amendment to section 1903.4, but the decision was rendered after the amendment. Although we did not discuss the ramifications of the amendment, the court did rely upon *Marshall v. W. & W. Steel Co., Inc.,* 604 F.2d 1322 (10th Cir. 1979). In *W. & W. Steel,* the Tenth Circuit held that the 1978 amendment to section 1903.4 was an interpretative rule and as such was exempt from the notice and comment rulemaking procedures under 5 U.S.C. § 553. We need not address this issue. Section 1903.4 of 29 C.F.R., both as originally promulgated and as amended, authorizes the Secretary to apply for OSHA inspection warrants *ex parte.* Our holding with respect to *ex parte* warrants does not rest upon the 1978 amendment.

Affirmed.