Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff, Appellee,

v.

WOLLASTON ALLOYS, INC., et al., Defendants, Appellants.

No. 82–1219.

United States Court of Appeals, First Circuit.

Argued Sept. 14, 1982.

Decided Dec. 6, 1982.

As Modified Jan. 6, 1983.

Rehearing and Rehearing En Banc Denied Feb. 2, 1983.

Robert D. Moran, with whom Vorys, Sater, Seymour and Pease, Washington, D.C., was on brief, for defendants, appellants.

Dennis K. Kade, Counsel for Appellate Litigation, U.S. Dept. of Labor, Washington, D.C., with whom Albert H. Ross, Regional Sol., Boston, Mass., T. Timothy Ryan, Jr., Sol. of Labor, Frank A. White,

Associate Solicitor for Occupational Safety and Health, and Andrea C. Casson, Attorney, Washington, D.C., were on brief, for plaintiff, appellee.

Before DAVIS,* CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Appellant, Wollaston Alloys, Inc., appeals from an order of the district court holding it in civil contempt for refusing to honor an earlier order that it comply with all but one provision of an Occupational Safety and Health Administration (OSHA) inspection warrant. Wollaston's challenges to the district court's order fall within two basic categories: (1) the inspection warrant was invalid because, for a number of reasons, it lacked an adequate showing of probable cause; and (2) the Secretary of Labor's inspection selection program was invalid because it was not published in the Federal Register. We find no merit in Wollaston's challenges and, therefore, affirm the district court's contempt order.

I. *Factual Background*

On July 31, 1981, a United States Magistrate issued a warrant for inspection under the Occupational Safety and Health Act (the Act) authorizing a named OSHA compliance officer or any other authorized compliance officer to enter the premises of Wollaston Alloys, Inc., in Braintree, Massachusetts, "during regular working hours or at other reasonable times" and to inspect "in a reasonable manner and to a reasonable extent as defined in Exhibit I ... the workplace" of Wollaston's employees. Exhibit I, attached to the warrant, was a two-page letter from OSHA to the employer. This letter stated that OSHA had selected the company for inspection as part of the agency's program for high-hazard safety inspections and then it briefly described that program's selection process.[1] The letter then

---

* Of the Federal Circuit, sitting by designation.

1. [S]pecific industries are selected for inspection on the basis of the injury rate for that industry in the Commonwealth of Massachu-

detailed the procedures to be followed by the compliance officer during the visit.[2] The warrant also authorized the inspection of records, files, and other items bearing on the existence of recognized hazards that would be likely to cause death or serious injury and on "whether this employer is complying with the Occupational Safety and Health standards promulgated under the Act and the rules, regulations, and orders issued pursuant to the Act."

The application for this warrant consisted of a sworn statement of the OSHA compliance officer and a five-page description of the Region I Targeting Alternative Project. In his statement the officer set forth the objective of the Targeting Alternative Project: "to focus safety inspection resources on industries known to have experienced a substantial percentage of all lost work day cases in Massachusetts [by directing inspections] at those occupations in which target injuries are likely to occur." The officer stated that Wollaston was within a high-hazard industry and had been scheduled for inspection according to the procedures of the Targeting Alternative Project. The officer also stated that the inspection would take place during regular working hours, would occur as soon as prac-

ticable after issuance of the warrant, and would be completed with reasonable promptness. The description of the Targeting Alternative Project indicated that OSHA would use data prepared by the Commonwealth of Massachusetts Department of Labor and Industries for the United States Bureau of Labor Statistics to help identify those industries having the highest incidence of serious injuries in the state. The project would rank industries, identified by their Standard Industrial Classification (SIC) numbers, in descending order according to their injury frequency rate—number of target injuries[3] per employee hours worked. The description in the warrant application stated that "specific site selection will be made alphabetically within SIC codes, as scheduling permits, starting with the top ranked SIC and working down in order of SIC code injury ranking." Inspections were to be scheduled for all establishments within a given SIC code before scheduling in the next ranked industry. The overall goal was to conduct 300 inspections annually under the program, and "firms which have had substantially complete safety inspections within the previous fiscal year (or 2 fiscal years with no serious violations cited)" would not be inspected.

setts. The injury rates are based on summary Workmen's Compensation data for serious injuries involving lost workdays. All establishments in the high-hazard industries are subject to inspection. The actual industries selected are those with the highest injury rates in the Commonwealth of Massachusetts. Once all establishments within the industry with the highest injury rate are visited, the establishments within the next highest-hazard industry are inspected, and so on.

2. After the opening conference, the compliance officer will ask to see your OSHA 200 log for the period between January 1, 1980, and the date of the inspection to determine what injury/illness patterns may be associated with certain operations within your establishment. The compliance officer will also have a list of occupation types which have experienced the greatest share of injuries within your industry. Once the compliance officer has analyzed your OSHA 200 log and determined whether or not certain occupations exist in your establishment, he or she will inspect the area where injury patterns have occurred or specific occupations are employed.

If the following conditions are met, no walk-around safety inspection will be conducted:
1) Your OSHA 200 log shows no previous recordable injuries, and
2) You do not employ workers in the occupations specified by the compliance officer, and
3) No serious hazardous conditions, which appear to be violations of OSHA standards, were observed by the compliance officer during his/her entry into the establishment.

If the above conditions are met but a recent complaint has been filed, the compliance officer will inspect only those items noted in the complaint.

3. Target injuries were defined using five "nature of injury" categories, which represented 42 percent of reported workmen's compensation cases, and four "type of injury" categories, accounting for 43 percent of all occupational injuries in the state. The target, or serious, injuries were defined as those lost workday cases relating to both the "nature of injury" and the "type of injury" categories. All of this information was set forth in detail in the description of the Project attached to the warrant application.

The compliance officer visited Wollaston three days after the magistrate issued the warrant, but was informed that the plant was in the midst of a shutdown which would last one more week. He returned two weeks later and served the warrant upon Wollaston's president who refused him entry based on the company's position that the warrant was invalid. Shortly thereafter the Secretary filed a petition for adjudication of civil contempt and Wollaston filed a motion to quash the warrant. After an oral hearing and consideration of briefs, the magistrate issued a report recommending, *inter alia,* that the district court adjudicate Wollaston in civil contempt and enter an order enforcing compliance with the warrant except to the extent that it authorized the use of personal sampling devices.[4] After oral argument on Wollaston's objections to the magistrate's report, the district court ordered, on February 16, 1982, that no further evidence be received, that Wollaston's motion to quash be denied, that Wollaston comply with the warrant except with respect to the taking of samples by personal sampling devices, and that the Secretary's petition for civil contempt be denied without prejudice.

On February 23, 1982, the compliance officer returned to Wollaston and presented its vice-president with a copy of the district court's order and the original warrant. The vice-president refused to permit the inspection and the Secretary then filed a second petition for adjudication of civil contempt. The court ordered Wollaston to show cause why it should not be adjudged in contempt. Wollaston's attorney received the order on February 26, 1982, and, being unable to attend the March 1 show cause hearing, requested the Secretary to inform the court that Wollaston wished to submit the matter for disposition on the basis of the compliance officer's affidavit. On March 1, 1982, the district court issued its order holding Wollaston in civil contempt and allowing Wollaston to purge itself of contempt by obeying its earlier order within forty-eight hours. The order provided for penalties of $5,000 per day if Wollaston failed to purge itself. Wollaston filed its appeal to this court from the district court's February 16 and March 1 orders and moved that court for a stay of its order. This motion for a stay was denied by the district court and then denied by this court on March 11. The company then allowed the inspection.

## II. *Validity of the Warrant*

Wollaston argues that the traditional "specific evidence" standard of probable cause applied in criminal cases was required for this inspection warrant because it authorized an inspection which was not limited to the civil penalty provisions of the Act. In *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 320, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978), the Supreme Court stated that "[p]robable cause in the criminal sense is not required" for an OSHA administrative search. Wollaston's argument is based in part on an OSHA directive to its compliance personnel issued in 1979, after *Barlow*'s was decided, which suggested that the agency should use the criminal as well as the civil provisions of the Act to deal with the problem of workplace deaths. Wollaston also cites a 1981 United States Department of Labor news release—indicating that the sanctions of the Act, 29 U.S.C. § 666(g) (1976) (fine of not more than $10,000, imprisonment for not more than six months, or both), for falsification of records required to be maintained may be imposed as a result of an inspection—as evidence of a shift in emphasis such that the criminal probable cause standard applies to this inspection. One commentator has stated that "[e]nforcement of OSHA rests on civil penalties, not criminal law." 1 K. Davis, Administrative Law Treatise § 4:11, at 258 (2d ed. 1978). We are not convinced that this basic enforcement approach has been changed and, in any event, criminal penal-

4. The magistrate found that the warrant's authorization of the use of personal sampling devices was not proper because the inspection plan focused on safety hazards, not health haz-

ards. At the hearing before the magistrate the Secretary had indicated that he would not press for enforcement of this portion of the warrant.

ties were not the main focus of the inspection at issue. The Supreme Court's holding in *Michigan v. Tyler* clearly indicates that for such inspections probable cause in the administrative sense is all that is necessary. In that case, the Court held that entry into a building by fire officials to fight a fire requires no warrant and that subsequent entries to investigate the fire's cause require an administrative warrant. Once officials believe that arson has occurred, however, further entry requires a warrant based upon a traditional showing of probable cause in the criminal sense. *Michigan v. Tyler,* 436 U.S. 499, 511–12, 98 S.Ct. 1942, 1950–51, 56 L.Ed.2d 486 (1978). In the instant case there has been no indication that the OSHA compliance officer suspected criminal violations or was seeking to find evidence of such violations. That criminal sanctions could possibly be imposed as a result of the inspection is not sufficient to alter the requisite probable cause showing.

In *Barlow's* the Court held that the Act is unconstitutional to the extent that it authorizes inspections without a warrant or its equivalent. 436 U.S. at 325, 98 S.Ct. at 1827. It also outlined the probable cause showing necessary for the issuance of an administrative inspection warrant. It stated that probable cause for such a warrant may be based "on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'" 436 U.S. at 320, 98 S.Ct. at 1824 (quoting *Camara v. Municipal Court,* 387 U.S. 523, 538, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)). The Court continued:

> A warrant showing that a specific business has been chosen for an OSHA search on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources such as, for example, dispersion of employees in various types of industries across a given area, would protect an employer's Fourth Amendment rights.

*Id.* 436 U.S. at 321, 98 S.Ct. at 1824–25 (footnote omitted). One commentator has stated that the Court's primary purpose here "was to provide some guarantee against arbitrariness," 3 W. LaFave, Search and Seizure § 10.2, at 224 (1978), and the Court itself indicated that its main concern was "unbridled discretion" in the hands of inspection officers. 436 U.S. at 321, 98 S.Ct. at 1825.

These probable cause requirements have been met in this case. The inspection program descriptions attached to the warrant application and to the warrant itself both described the program in detail, satisfying a specific requirement the Supreme Court seemed to impose in *Barlow's,* 436 U.S. at 323 n. 20, 98 S.Ct. at 1826 n. 20, and provided enough information to show that Wollaston's selection was not arbitrary. Much more information was provided with this warrant application than with the application upheld in *In re Establishment Inspection of Gilbert & Bennett Manufacturing Co.,* 589 F.2d 1335 (7th Cir.), *cert. denied,* 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979). That application merely informed the magistrate that the employer had been selected under a " 'National-Local plan' designed to reduce the 'high-incidence' of occupational injuries in the 'foundry industry.'" *Id.* at 1342. As already shown, the application in this case provided detailed information on how industries and employers within those industries were selected. This is not a case like *Marshall v. Weyerhaeuser,* 456 F.Supp. 474, 479–80, 482–83 (D.N.J.1978), in which there was no indication that the employer was selected as a result of any systematic, nonarbitrary process.

In discussing the requirements for an administrative warrant, the Court in *Barlow's* criticized the Secretary's warrant application because no "facts [were] presented that would indicate why an inspection of Barlow's establishment was within the program." 436 U.S. at 323 n. 20, 98 S.Ct. at 1826 n. 20. Wollaston relies on this footnote to argue that the magistrate himself must determine that the intended inspection falls within the program, and that the magistrate here could not have made such a determination because he did not even know Wollaston's SIC code. We cannot

agree with the practical effect of this contention, that the magistrate must review in detail and trace every determination and computation of the Secretary; we do not see the magistrate as the Secretary's auditor. Given the detailed description of the program's selection process in the application, it was acceptable for the magistrate to rely upon the compliance officer's sworn statement that Wollaston had been selected according to the procedures specified in the program. The Ninth Circuit apparently took the same position in upholding a challenged warrant in *Stoddard Lumber Co. v. Marshall*, 627 F.2d 984 (9th Cir.1980). That case was similar to the present one in that the warrant application included a detailed description of the selection plan and the OSHA area director's sworn statement that the company was selected under the plan without the influence of other factors. *Id.* at 988. The only additional information provided in the *Stoddard Lumber* application was that the injury rate in the lumber industry was 1.8 times the national rate. Surely this one piece of extra information was not sufficient on its own to justify the court's finding of probable cause. In his dissent in *Barlow's*, Justice Stevens alluded to the worth of sworn statements presented to a magistrate. He stated that the "prospect of having to make bad faith representations in an ex parte warrant proceeding" would be as likely to deter an official from making a harassing, nonroutine inspection as would the prospect of revealing his intentions to his superiors or making false representations to a court while seeking compulsory process. 436 U.S. at 333, 98 S.Ct. at 1831 (Stevens, J., dissenting).

The *Barlow's* Court stated that one function of an administrative inspection warrant is to "advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed." 436 U.S. at 323, 98 S.Ct. at 1826 (footnote omitted). Wollaston raises several arguments that there were no limits to

the search authorized by the warrant. For example, it maintains that there were no physical limits to the inspection authorized by the warrant and that the manner of conducting the inspection also was not limited. The warrant, however, explicitly stated that the inspection was limited to "the workplace or environment where work is performed by employees." The letter referred to in the warrant and attached to it explicitly outlined the steps to be taken by the compliance officer during the inspection. *See supra* note 2. The warrant then stated that the inspection would extend to "all pertinent conditions, structures, machines, apparatus, devices, equipment, materials, and all other things therein (including records, files, papers, processes, controls, and facilities) . . . ." The warrant also included the more general requirements that the inspection be conducted in a reasonable manner and during reasonable hours. This language in the warrant closely tracked the language of the Act, *see* 29 U.S. § 657(a)(2) (1976), and the Secretary's regulations, *see* 29 C.F.R. § 1903.3(a) (1981). The *Barlow's* Court seemed to imply that these limits in a warrant are acceptable when it noted that the order issued in that case reflected much of the same regulatory and statutory language. 436 U.S. at 323 n. 21, 98 S.Ct. at 1826 n. 21.[5] In a more recent case, however, the Court indicated that this regulatory and statutory language may not provide the protection required by the fourth amendment. *See Donovan v. Dewey*, 452 U.S. 594, 600–02, 101 S.Ct. 2534, 2538–40, 69 L.Ed.2d 262 (1981) (distinguishing the Act from the Federal Mine Safety and Health Act of 1977, which provides for warrantless inspections that the Court held met the reasonableness requirement of the fourth amendment). Even if such language does not satisfy the amendment, the more specific language in the program description letter was sufficient to advise the employer of the scope, objects, and limits of the search.

**5.** It is difficult to conclude with certainty that the Court viewed such language as meeting the requirements of an administrative inspection warrant because of the nondefinitive nature of

this portion of the *Barlow's* opinion: the Court never concluded that the process obtained in that case satisfied the fourth amendment. *See* 436 U.S. at 325 n. 23, 98 S.Ct. at 1826 n. 23.

For similar reasons, Wollaston's claim that the warrant was not tailored to the inspection program lacks merit. The company maintains that the program was confined to safety inspections but the warrant authorized an inspection for violations of both safety and health provisions of the Act. It is true that the warrant concludes with the general statement that the inspection will cover items bearing upon "whether this employer is complying with the Occupational Safety and Health standards promulgated under the Act and the rules, regulations, and orders issued pursuant to the Act." We think, however, that the much more detailed and specific language of the program description letter referred to earlier in the warrant and attached thereto controls to define the objectives and limits of the inspection. The district court properly recognized this when it ordered Wollaston to comply with the warrant except with respect to the taking of samples by personal sampling devices, a procedure that focuses on health violations. This warrant provided the employer with sufficiently detailed notice of the objectives and scope of the inspection such that the employer could identify inspection procedures that exceeded its scope.

Wollaston also claims that the inspection program was virtually silent as to the frequency of inspections and that there were no time limits upon the warrant. At least two provisions in the inspection program, however, bear on the frequency of inspections at any given establishment. First, the program description in the warrant application stated that "firms which have had substantially complete safety inspections within the previous fiscal year (or 2 fiscal years with no serious violations cited) will be deleted from the targeting universe."[6] In addition, firms inspected under the program in 1981 and scheduled for a second inspection in 1982 would only be inspected in the second year if the first inspection resulted in citation for one or more serious violations. Second, the program stated an initial goal of conducting 300 inspections annually. When this goal is considered in light of the selection procedures specified in the plan it becomes clear that the program protected employers from the burden of too frequent inspections. As to time limits, it is true that the warrant did not state on its face any time within which the inspection was to have occurred. The warrant process did provide the employer some protection, however, because the application stated that the inspection "will begin as soon as practicable after the issuance of this Warrant and will be completed with reasonable promptness." Although we have held that a criminal warrant should indicate time limits, *United States v. Abrams,* 615 F.2d 541, 548 (1st Cir.1980), we do not think the absence of time limits is fatal to the warrant in question because the basic requirements in *Barlow's* for protecting the employer's fourth amendment rights have been satisfied. The warrant provided Wollaston with assurance that it was chosen on the basis of a general plan derived from neutral principles. The plan set forth procedures for the officer to follow during the inspection. In this context, the warrant's failure to state explicitly the date the inspection was to be conducted did not devolve "almost unbridled discretion" upon the officer.[7]

Wollaston further argues that the warrant is invalid statutorily because it authorized the examination of records during the officer's physical inspection of the establishment. Wollaston relies on *In re Establishment Inspection of Inland Steel Co.,* 492

6. Indeed, OSHA inspectors had begun an inspection of Wollaston in April 1979. This inspection was never substantially completed, however, as compliance officers withdrew from the premises when the company refused to allow them to interview employees. *See Marshall v. Wollaston Alloys, Inc.,* 479 F.Supp. 1102, 1103 (D.Mass.1979).

7. Wollaston maintains that if warrants lacking explicit time constraints were valid compliance officers could obtain them in batches and use them whenever necessary. Although such a scenario perhaps would raise constitutional concerns, *contra* 1 Davis, *supra,* § 4.11, at 258 (speculating that under *Barlow's* an inspector could constitutionally obtain warrants by the batch), it is quite unlike the case before us and we intimate no opinion on this whatsoever.

F.Supp. 1310, 1314–16 (N.D.Ind.1980), and *In re Establishment Inspection of Kulp Foundry, Inc.,* 691 F.2d 1125 (3d Cir.1982), both of which held that the exclusive means of access to records provided for in the statute is by subpoena. *Inland Steel* is somewhat distinguishable, however, because it involved medical and job history records of employees, whereas the inspection program here provided for access to the company's OSHA 200 log, a document Wollaston was required by regulation to maintain. It is reasonable to assume that an employer would have less of a privacy interest in a document it is required by statute or regulation to maintain than in a document it produces and maintains on its own. *Cf.* 1 Davis, *supra,* § 4:21, at 288–90 (discussing reduced fifth amendment protection for documents required to be maintained). *Kulp Foundry* is similarly distinguishable as the court in that case explicitly stated that it was not deciding the question of whether a subpoena is necessary for access to records an employer is required to make available under 29 U.S.C. § 657(c)(1) (1976). *Kulp Foundry,* at 1132 n. 18. More importantly, we find that the subpoena procedure is not the exclusive statutory means of OSHA access to records that an employer must maintain; the Act explicitly provides access to records such as the OSHA 200 log by stating:

> Each employer shall make, keep, and preserve, and *make available to the Secretary* . . . such records regarding his activities relating to this chapter as the Secretary . . . may prescribe by regulation as necessary or appropriate for the enforcement of this chapter or for developing information regarding the causes and prevention of occupational accidents and illnesses.

29 U.S.C. § 657(c)(1) (1976) (emphasis added). This section applies to the OSHA 200 log because that record is required to be maintained by 29 C.F.R. § 1904.2 (1981). There is no indication in the statute and there is no logical reason why such information should not be made available during an inspection.

There is one aspect of the warrant, however, that causes us concern: the general language at the end,[8] which seems to be standard boilerplate in many OSHA inspection warrants. But in this case it is not fatal when the warrant is considered in its entirety and has not resulted in an unreasonable expansion of the compliance officer's inspection procedures. We have already indicated that the detailed and specific language of the program description attached to the warrant controls to define the objectives and limits of the inspection. Similar reasoning applied in a recent criminal case in which we held that a warrant's flaws in impermissibly authorizing the seizure of certain records did not invalidate the entire warrant or require the suppression of evidence that was properly seized. *United States v. Riggs,* 690 F.2d 298 (1st Cir.1982). As we stated, " '[i]t would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well.' " *Id.* at 300 (quoting 2 W. LaFave, Search and Seizure § 4.6(f), at 111–12 (1978)).

We find that the inspection warrant in this case was valid, was based on sufficient probable cause as outlined in *Barlow's,* and did not exceed its probable cause.

■ Wollaston offered two additional arguments which we dispose of in short order. First, it maintained that there was no probable cause basis for the inspection pursuant to the district court's February 16, 1982 order because in the interim the inspection program had been replaced with a nationwide program. We agree with the Ninth Circuit, however, that an employer should not be entitled to prevent an inspection by

---

8. Authorizing the inspection of records, files, and other items bearing on the existence of recognized hazards and on "whether this employer is complying with the Occupational Safety and Health Standards promulgated under the Act and the rules, regulations, and orders issued pursuant to the Act."

litigating at every turn and then, when the warrant is finally upheld, maintain that the warrant has become stale. *Hern Iron Works, Inc. v. Donovan,* 670 F.2d 838, 840 (9th Cir.1982) (quoting *Federal Casting Div. Chromalloy American Corp. v. Donovan,* 514 F.Supp. 617, 618–19 (E.D.Wisc.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982)). Second, Wollaston argues that the warrant's authorization of private employee interviews is contrary to the Act and amounts to a taking of its property without due process. Private interviews, however, are explicitly authorized by the statute, *see* 29 U.S.C. § 657(a)(2); *In re Establishment Inspection of Keokuk Steel Casting,* 638 F.2d 42, 46 (8th Cir.1981); *Marshall v. Wollaston,* 479 F.Supp. at 1103, and do not conflict with the employer's statutory right to accompany the inspector. *Donovan v. Metal Bank of America, Inc.,* 516 F.Supp. 674, 681 (E.D.Pa.1981). Courts have rejected similar due process arguments when warrants have been issued after adversarial hearings, *id.* at 680, and the argument is equally untenable when a warrant is issued after an ex parte hearing.

III. *Validity of the Inspection Program*

Wollaston claims that the inspection program itself is invalid because the Secretary failed to publish it in the Federal Register. It contends that the inspection program is a "rule" as defined by 5 U.S.C. § 551(4) (1976), and thus its publication is required by 5 U.S.C. § 552(a)(1) (1976). This statute states that "a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1) (1976). The agency information it requires to be published includes "statements of the general course and methods by which [the agency's] functions are channelled and determined, including the nature and requirements of all formal and informal procedures available," and "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency . . . ." *Id.*

■ We have previously recognized that the failure to publish in the Federal Register does not automatically invalidate a regulation. *Pitts v. United States,* 599 F.2d 1103, 1107–08 (1st Cir.1979). Courts have held that under this section "the requirement for publication attaches only to matters which if not published would adversely affect a member of the public." *Hogg v. United States,* 428 F.2d 274, 280 (6th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 805 (1971), *cited in United States v. Fitch Oil Co.,* 676 F.2d 673, 678 (Em.App. 1982); *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391, 1404–05 (Em. App.1975). We fail to see how Wollaston could have been adversely affected by OSHA's failure to publish the inspection program in the Federal Register, and in fact Wollaston has never claimed that it was adversely affected. There is no alternative course of action that Wollaston might have taken had the program been published, and the company would have been selected for inspection in any event. *Cf. Stoddard Lumber,* 627 F.2d at 986–88 (holding that the publication requirements of 5 U.S.C. § 553 do not apply to an OSHA inspection program in part because "the absence of notice and comment procedures very likely will not prejudice owners").

In addition, the statute requires an agency merely to make available to the public—rather than publish—"those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register," 5 U.S.C. § 552(a)(2)(B) (1976), and "administrative staff manuals and instructions to staff that affect a member of the public," *id.* § 552(a)(2)(C). The inspection program was an internal procedure for selecting establishments to be inspected and was typical of the type of information provided in agency staff manuals; thus, it falls within subsection (a)(2) of section 552 and not subsection (a)(1). The program did not have a significant impact on the substantive rights of employers such that it was required by the statute to be published in the Federal

Register. In this sense, the inspection program is distinguishable from the Secretary of Agriculture's instruction in *Anderson v. Butz,* 550 F.2d 459, 463 (9th Cir.1977), which increased the cost of food stamps to recipients.

There is a question of whether this issue is properly before us on appeal because Wollaston never raised it at the district court; Wollaston contends that it has never had an opportunity to raise it. In any event, it is clear that OSHA's failure to publish the inspection program in the Federal Register does not render that program invalid.

*Affirmed.*