Sturm Ruger v. USA                    CV-98-418-JD  12/08/98

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

Sturm Ruger & Company, Inc.

    v.                                      Civil No. 98-418-JD

United States of America

**REPORT AND RECOMMENDATION**

The United States of America, on behalf of the Occupational Safety and Health Administration ("OSHA"), applied for and obtained a warrant from Judge McAuliffe for a comprehensive health and safety inspection of the Pine Tree Castings Division ("Pine Tree") of Sturm Ruger & Company, Inc. ("Sturm Ruger"), in Newport, New Hampshire. Sturm Ruger filed a motion to quash the warrant, which it amended (document no. 6). The Government filed a cross-motion (document no. 9). These motions are before me for review pursuant to 28 U.S.C. § 636(b)(1)(B). For the following reasons, I recommend that: (1) the motion to quash be denied, (2) the cross-motion be granted, and (3) Sturm Ruger be directed to submit to an inspection of Pine Tree in accordance with the warrant.

**BACKGROUND**

Sturm Ruger manufactures guns at a facility comprised of several buildings located in Newport, New Hampshire. Sturm Ruger is classified under a Standard Industrial Classification ("SIC")

code of 3484 (Small Arms).[1]

Pine Tree, a division of Sturm Ruger, is housed completely within one of the buildings at the Sturm Ruger facility. Pine Tree manufactures steel investment castings and is categorized on a Dun and Bradstreet report under a SIC code of 3324 (Steel Investment Foundry). Approximately 60% of the castings manufactured by Pine Tree are used in Sturm Ruger guns, while the remainder is sold to third parties. Of the approximately 1,000 Sturm Ruger employees in Newport, there are approximately 280 in the Pine Tree division.

OSHA requires employers covered by the Occupational Safety and Health Act of 1970 ("Act") to maintain records and report certain occupational injuries and illnesses. See 29 C.F.R. Part 1904. In February 1997, OSHA issued a rule authorizing it to

---

[1] The Standard Industrial Classification (SIC) was developed for use in the classification of establishments by type of activity in which they are engaged; for purposes of facilitating the collection, tabulation, presentation, and analysis of data relating to establishments; and for promoting uniformity and comparability in the presentation of statistical data collected by various agencies of the United States Government, State agencies, trade assocations, and private research organizations.

Office of Management and Budget, Standard Industrial Classification Manual (1987) (hereinafter "SIC Manual"), available in Westlaw, SIC Database, SIC Manual Intro, at *1.

collect data from employers on an annual survey form.  See 29 C.F.R. § 1904.17(a) (1998).

On April 22, 1997, OSHA sent a data collection form to "Sturm Ruger & Company, Inc., Pine Tree Castings Division."  Ex. C to Sturm Ruger's Supplemental Amended Motion to Quash (hereinafter "Supp'l Mot. to Quash").  The form lists the "establishment" as having approximately 285 employees, with a SIC code of 3484 (Small Arms).  The form's instructions indicate that OSHA was seeking totals from the "1996 Log and Summaries of Occupational Injuries and Illnesses (OSHA No. 200)".  See 29 C.F.R. §§ 1904.2 & 1904.6 (regarding OSHA 200 log and recordkeeping).  The instructions on the form further request that the addressee correct the address and SIC code for the establishment directly on the form.

An occupational health nurse employed by Sturm Ruger completed the form, using Lost Work-Day Injury and Illness ("LWDII") statistics unique to Pine Tree, rather than numbers applicable to Sturm Ruger as a whole.  In addition, the nurse inserted an arrow on the address label pointing to "Pine Tree Castings Division," crossed out the SIC code for "small arms," and changed the SIC code to "33 - Foundry Castings."

On June 15, 1998, OSHA compliance officers Donald D. DeWees and James W. Tobey arrived at Pine Tree bearing a letter

3

addressed to "Sturm Ruger and Company, Inc." See Affidavit of James W. Tobey at ¶ 4 (hereinafter "Tobey Affidavit"), attached to Warrant Application (document no. 1). When Lynn Merrill, Sturm Ruger's Director of Human Resources, inquired why the letter was addressed to Sturm Ruger, Mr. Tobey responded that the letter was addressed to Sturm Ruger in "the generic sense" and that the inspection was for Pine Tree. Id. Mr. Tobey used a pen to change the address to read "Sturm Ruger & Company, Inc., Pine Tree Castings Division," after Ms. Merrill questioned him about the addressee and after she said that the attorney wanted a copy. Id.

The letter begins, "Dear Employer: Your establishment has been selected for a comprehensive safety and health inspection under OSHA's interim targeting system." The letter explains that "worksites at or above the industry average LWDII [Lost Work-Day Injury and Illness] rate," were selected for inspection, out of approximately 100 industries having the highest LWDII rates overall. (A copy of the letter without a hand-written correction to the address is Exhibit H to the Supplemental Motion to Quash.)

After reviewing the letter and contacting an attorney by telephone, Ms. Merrill refused to consent to the inspection. Before leaving, the compliance officers declared that OSHA might seek a warrant, and Ms. Merrill stated that she understood.

4

On June 30, 1998, OSHA applied for and obtained a warrant for an inspection of Pine Tree, pursuant to, among other things, OSHA's Interim Plan for Inspection Targeting (hereinafter "Interim Plan"). See Warrant Application (document no. 1). After Judge McAuliffe issued the warrant, OSHA compliance officers attempted to execute it on July 6, 1998, without success. Officials at Sturm Ruger denied entry to Pine Tree and refused to permit OSHA to conduct the inspection.

On the same day, Sturm Ruger filed its motion to quash the warrant. The Government responded by moving for civil contempt or for an order to show cause. This court denied the petition for contempt and construed the remainder of the motion as, in effect, a motion to enforce the warrant. The cross-motions were referred to me for a Report and Recommendation. Following a hearing on September 22, 1998, the parties filed supplemental memoranda concerning the Interim Plan and the events leading to Pine Tree's selection for an inspection.

In its motion, Sturm Ruger maintains that: (1) OSHA lacked authority to collect the data that formed the basis of Pine Tree's targeting under the Interim Plan; (2) Pine Tree's selection was in retaliation for Sturm Ruger's (unsuccessful)

5

legal challenge to an OSHA subpoena[2]; (3) there is no basis for upholding Judge McAuliffe's finding of probable cause; and (4) the scope of the warrant is too broad.  These arguments are addressed below.

**ANALYSIS**

I.   Data Collection and Pine Tree's Status

**A.   Regulatory Authority for Data Collection**

Sturm Ruger's principal contention is that OSHA lacked the regulatory authority to collect the data from Pine Tree that OSHA used in selecting Pine Tree for an inspection.

The regulation at issue provides as follows:

> Each employer shall, upon receipt of OSHA's Annual Survey Form, report to OSHA or OSHA's designee the number of workers it employed and number of hours worked by its employees for periods designated in the Survey Form and such information as OSHA may request from records required to be created and maintained pursuant to 29 C.F.R. part 1904.

29 C.F.R. § 1904.17(a) (1998).

Sturm Ruger's specific claim is that 29 C.F.R. § 1904.17(a) authorizes the collection of data on an employer-wide basis only, and not, allegedly, per establishment.  In implementing this regulation, however, OSHA sent out annual survey forms, such as

---

[2]See Reich v. Sturm Ruger & Co., 903 F. Supp. 239 (D.N.H. 1995) ("Sturm Ruger I"), aff'd sub. nom United States v. Sturm Ruger & Co., 84 F.3d 1 (1st Cir.), cert. denied, 117 S. Ct. 480 (1996).

that received in April 1997 by Sturm Ruger's Pine Tree division, which asked for establishment-specific data. Because of the deference due to OSHA's interpretation, the court should reject Sturm Ruger's argument.

"It is well established that 'an agency's construction of its own regulations is entitled to substantial deference.'" Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 152 (1991) (citations omitted). A reviewing court "must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (citations omitted). See also Martin, 499 U.S. at 152 ("the power to render authoritative interpretations of the OSH Act regulations is a 'necessary adjunct' of the Secretary's powers to promulgate and to enforce national health and safety standards").

The plain language of 29 C.F.R. § 1904.17(a) does not specifically address the issue highlighted by Sturm Ruger. While the regulation refers to the employer's obligation to report certain information, it does not specify whether such information, particularly as to the number of employees and their hours, should be reported on an employer-wide basis, or per

7

establishment. The regulation's silence on this particular issue sets the stage for deference to the agency's reasonable interpretation.

Read in the context of the recordkeeping requirements of Part 1904, OSHA's interpretation of its regulation is reasonable. Pursuant to 29 C.F.R. § 1904.2(a)(1), each employer is required to "maintain in each establishment a log and summary of all recordable occupational injuries and illnesses for that establishment." Employers are, among other things, required to: post such data annually "in each establishment," 29 C.F.R. § 1904.5(d)(1), keep the logs for five years, id. § 1904.6, and make the data available to employees and to OSHA inspectors on request, id. §§ 1904.7(a) & (b)(1). Since 29 C.F.R. § 1904.17(a) specifically authorizes OSHA to collect certain establishment-specific data that employers are required to maintain "pursuant to 29 C.F.R. part 1904," a contextual reading of the regulation affirms the reasonableness of OSHA's interpretation.

Sturm Ruger makes much of the fact that OSHA initiated a rulemaking in 1996 that it has not yet completed, see 61 Fed. Reg. 4030 (Feb. 2, 1996) (notice of proposed rule). The proposed revisions to part 1904 would have included a provision referring to employee hours and the number of employees in connection with information to be posted in each establishment.

The fact that this provision has not yet been promulgated does not circumscribe the scope of the annual survey that section 1904.17(a) already authorizes.  Nor does OSHA's failure to promulgate additional revisions when it promulgated section 1904.17(a) imply an intent to limit the scope of its authority to collect data.  The provision at issue, 29 C.F.R. § 1904.17(a), even without reference to the proposed, uncodified section, is reasonably interpreted as authorizing the collection of establishment-specific data.

OSHA's intent to target establishments for data collection was clearly expressed when section 1904.17(a) was promulgated. OSHA declared its need for establishment-specific data, so that it could marshal its inspection resources most efficiently.  See, e.g., 62 Fed. Reg. 6434, 6435 (Feb. 11, 1997) (preamble to final rule) ("OSHA also needs establishment-specific data to better target its program activities, including workplace inspections and non-enforcement information and incentive programs, to the more hazardous workplaces."); id. at 6437 ("there is no substitute for a large body of site-specific information gathered by the survey method").  Moreover, OSHA emphasized its need for employment figures to evaluate such establishment-specific data. See id. at 6437 ("Employment figures are critical to OSHA's ability to evaluate the injury and illness data . . . .").  These

9

statements of intent reinforce OSHA's claim that its current interpretation comports with the agency's purpose in promulgating the regulation.

Finally, OSHA's construction of its regulation makes sense. Employers are required by other sections of part 1904 to maintain injury and illness data for each establishment, and the collection of such data is expressly authorized by 29 C.F.R. § 1904.17(a). In order to convert such establishment-specific data into meaningful rates, OSHA logically required similar, establishment-specific employment figures. To construe the regulation, as Sturm Ruger would, to authorize only the collection of employment figures on an employer-wide basis would not allow OSHA to calculate establishment specific injury and illness rates. Employer-wide rates would not serve OSHA's intent to target high-injury workplaces for inspections. Therefore, OSHA's interpretation is eminently reasonable.

OSHA's sensible interpretation of 29 C.F.R. § 1904.17(a) in this case is consistent with the relevant regulatory language and OSHA's statement of its intent. The regulation thus authorizes the collection of establishment-specific employment figures. In the context of a matter so clearly within OSHA's province and expertise, namely, the data necessary to make appropriate enforcement decisions, deference to OSHA's interpretation is

particularly appropriate.  Sturm Ruger's contention to the contrary must be rejected.

**B.    <u>Pine Tree's Status as an Establishment</u>**

According to Sturm Ruger, Pine Tree is not an establishment. Rather, it is part of an integrated operation and thus, it allegedly cannot be singled out for inspection or data collection.  This argument is unavailing, both as a factual matter, and in light of the double-layer of deference surrounding OSHA's finding that Pine Tree is an establishment and Judge McAuliffe's issuance of the warrant.

**1.    <u>Deference to OSHA's Finding</u>**

OSHA's inspection authority permits the inspection of, among other things, "establishment[s] . . . where work is performed by an employee of an employer."  29 U.S.C. § 657(a).  The regulatory definition of "establishment" for the purposes of OSHA's data collection authority is the following:

> <u>Establishment:</u>  A single physical location where business is conducted or where services or industrial operations are performed.  (For example:  A factory, mill, store, hotel, restaurant, movie theater, farm, ranch, bank, sales office, warehouse, or central administrative office.)  Where distinctly separate activities are performed at a single physical location (such as contract construction activities operated from the same physical location as a lumber yard), each activity shall be treated as a separate establishment.

29 C.F.R. § 1904.12(g)(1).  This definition is based on the definition of an establishment in the <u>SIC Manual</u>.

11

As noted in the Tobey Affidavit, Pine Tree is classified by OSHA as a separate establishment since, among other things, its principal activity, steel investment castings, is different than Sturm Ruger's. Indeed, Dun and Bradstreet reports include separate listings for Sturm Ruger (small arms, 3484) and for Pine Tree (steel investment foundry, 3324). In addition, Pine Tree sells its output to third parties, not just to Sturm Ruger.

OSHA further maintains that the criteria used in the definition of an establishment in the SIC Manual show that Pine Tree is an establishment in its own right. The SIC Manual provides that, among other things, "[w]here distinct and separate economic activities are performed at a single physical location," the activities may be classified as separate establishments if:

> (1) no one industry description in the classification includes such combined activities; (2) the employment in each such economic activity is significant; and (3) separate reports can be prepared on the number of employees, their wages and salaries, sales or receipts, and other types of establishment data.

SIC Manual, SIC Manual Intro, at *2. No single SIC code covers both small arms and steel investment foundries. Approximately 280 of the more than 1,000 Sturm Ruger employees in Newport work for Pine Tree. And, as shown by the occupational health nurse's completion of the OSHA annual survey for Pine Tree and as manifested by the separate Dun and Bradstreet report for Pine Tree, separate reports on employment figures and other types of

12

establishment data can be prepared for Pine Tree. While Sturm Ruger cites other factors to suggest that Pine Tree is not a separate entity, OSHA's classification of Pine Tree as a separate establishment is plainly reasonable.[3]

A reviewing court must defer to an agency's interpretation of its own regulation especially when the regulation concerns a complex, highly technical regulatory program "in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Thomas Jefferson Univ., 512 U.S. at 512 (citations omitted). Such deference is appropriate here. OSHA's decision regarding Pine Tree's status as an establishment under its regulations is part of a complex, technical regulatory program, ultimately involving OSHA's expertise and exercise of judgment relating to its own enforcement policy initiatives.

---

[3]OSHA's determination that Pine Tree is a separate "establishment" comports with an earlier OSHA decision on a similar matter. Confronted with the question of whether the Coors brewery, can plant, bottle plant, and maintenance service were separate establishments for the purposes of calculating LWDI rates, even though they were located in one contiguous location in Colorado (covering several hundred acres) and shared the same accounting, central management, and payroll, OSHA headquarters concurred with the regional office's determination that the four entities were separate establishments. See Mem. to Byron R. Chadwick, Reg'l Admin., from Thomas J. Shepich, Director, Directorate of Compliance Programs (Oct. 16, 1998), available at <http://www.osha-slc.gov/OshDoc/Interp_data/I19891016.html>.

Therefore, without reference to the fact that Ms. Merrill told OSHA on the date of the failed execution of the warrant that Pine Tree employees are paid with Pine Tree checks and Sturm Ruger employees are paid with Sturm Ruger checks, see Declaration of James W. Tobey at ¶ 5 (July 8, 1998) (hereinafter "Tobey Declaration"), Ex. D to Mem. of Law in Support of Pet. for Adjudication of Civil Contempt (document no. 4), I find that OSHA's finding on Pine Tree's status as an establishment is reasonable. Moreover, setting aside the question of whether Sturm Ruger is estopped from asserting that Pine Tree is not an establishment – given that the Sturm Ruger occupational health nurse corrected the OSHA survey to refer unambiguously to Pine Tree as an "establishment" – I find that the court should defer to OSHA's finding.

## 2. Deference to Issuing Judge

Sturm Ruger's argument that Pine Tree is not an establishment also fails in light of the obligation to defer to reasonable inferences that the issuing judge may have drawn from the facts presented to it. In light of the "strong preference for warrants under our Fourth Amendment jurisprudence," reviewing courts must accord "'considerable deference' to the 'probable cause' determination made by the issuing [judge]." United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996) (citation

14

omitted). See also Ornelas v. United States, 517 U.S. 690, 699 (1996) ("scrutiny applied to a magistrate's probable-cause determination to issue a warrant is less than that for warrantless searches" to provide incentive for use of warrant process). The issuing judge's factual findings are not to be overturned on review unless clearly erroneous. See United States v. Sawyer, 144 F.3d 191, 193 (1st Cir. 1998). "The reviewing court must examine the affidavit in a practical, common sense fashion, and accord considerable deference to reasonable inferences the issuing magistrate may have drawn from the attested facts." Zayas-Diaz, 95 F.3d at 111 (internal brackets and quotation marks omitted). The reviewing court may reverse only if there is no substantial basis for concluding that probable cause existed. See Sawyer, 144 F.3d at 193.

Judge McAuliffe reviewed the Tobey Affidavit, which states that Pine Tree is an "establishment" and that, "[a]s a separate business, it can be examined independently." Tobey Affidavit ¶ 3. The additional facts cited in the Tobey Affidavit support the conclusion that Pine Tree is a separate establishment. See id. A common-sense reading of the affidavit yields a substantial basis for a finding that Pine Tree is an "establishment," thus suitable for an inspection under the Interim Plan. Sturm Ruger's contention that Pine Tree is not an establishment must be

15

rejected.

## II.  Retaliation

Sturm Ruger next contends that the warrant should be quashed because the motive for targeting Pine Tree was retaliatory.  This argument is not supported by the evidence and must be rejected in deference to Judge McAuliffe's factual findings.

The facts considered by Judge McAuliffe in issuing the warrant are set forth in the Tobey Affidavit, OSHA's Interim Plan (April 15, 1998),[4] and a copy of a June 15, 1998 letter to Pine Tree, all of which are attached to the application.  (The letter, in pertinent part, is identical to the letter hand-delivered to Sturm Ruger on June 15, except that the addressee is type-written as "Sturm Ruger & Company Inc., Pine Tree Castings Division," and not hand-written, as Mr. Tobey described in his affidavit.  The discrepancy is inconsequential, since Judge McAuliffe had before him Mr. Tobey's sworn statement that the letter was addressed only to Sturm Ruger, and that he altered the name in ink while on the premises to match OSHA's intent to inspect Pine Tree.)

As to whether the selection of Pine Tree was retaliatory,

---

[4]The Interim Plan was amended in August 1998.  See OSHA Directive No. 98-3 (CPL 2) (Aug. 14, 1998), Ex. G to Sturm Ruger's Reply to Order (document no. 20).  Since the April version of the plan was applicable at all relevant times, the court should consider the April version in connection with its review of Judge McAuliffe's issuance of the warrant.

16

the Tobey Affidavit states that Pine Tree was selected for an inspection pursuant to the procedures set forth in the Interim Plan. Mr. Tobey specifically elaborated on these selection procedures:

> OSHA's interim inspection system specifically uses 1996 Bureau of Labor Statistics (BLS) data to select the industries, as characterized by the three or four-digit SIC Codes, with highest LWDII rates. The interim inspection system then selects for inspection those worksites at or above the industry average LWDII rate for that three or four-digit SIC Code. Sturm Ruger & Company, Inc., Pine Tree Castings Division, with a SIC Code of 3324, falls into an industry with one of the highest LWDII rates. The company's 1996 LWDII Rate of 9.92 exceeded the company's industry 1996 BLS SIC Code LWDII Rate of 6.7. <u>This company was selected for inspection per the procedures outlined in OSHA's Interim Plan for Inspection Targeting as referred to above.</u>

Tobey Affidavit ¶ 2 (emphasis added). By specifying that the procedures outlined in the Interim Plan provided the mechanism for selecting Pine Tree, the Tobey Affidavit indicates that no extraneous considerations (such as retaliation), outside the Interim Plan's outline, played a part in the selection.

In effect, Sturm Ruger contests the truthfulness of the statements in the affidavit. The reviewing court is required to hold a hearing to investigate the veracity of factual averments offered in support of a warrant application in very limited circumstances. If a challenger's attack is more than merely conclusory, and if the challenger makes an offer of proof to

17

support its allegation of "deliberate falsehood or of reckless disregard for the truth," it will be entitled to such a hearing if it can also show that there is insufficient content in the warrant affidavit otherwise to support probable cause. Franks v. Delaware, 438 U.S. 154, 172-73 (1978).

Sturm Ruger does not make the necessary showing under Franks. Rather, it: (1) challenges Mr. Tobey's interpretation of the Interim Plan as applicable to "worksites," as opposed to "establishments"; (2) shows that OSHA mixed and matched Sturm Ruger's and Pine Tree's name and SIC codes in internal correspondence and in correspondence with Sturm Ruger; and (3) questions the averment that steel investment foundries (SIC code 3324) have "one of the highest LWDII rates" (notably, the industry is among the top 99 industries surveyed by BLS). These contentions and others raised by Sturm Ruger, regarding evidence cited by the Government in support of its motion, provide no basis for finding deliberate falsehood or reckless indifference to the truth in the affidavit. No Franks hearing is warranted.

Thus, the contention regarding a retaliatory motive must be rejected. There is substantial evidence – from a common-sense reading of the affidavit, a review of the Interim Plan, and reference to the June 15, 1998 letter – for the inference that Pine Tree was selected pursuant to the Interim Plan, and not

18

because of a retaliatory motive or any other non-neutral ground. As explained below, a finding of a non-neutral motive such as retaliation would have been inconsistent with Judge McAuliffe's ultimate finding of probable cause. The conclusion that retaliation did not come into play is entitled to deference. <u>See Zayas-Diaz</u>, 95 F.3d at 111.

## III. <u>Administrative Probable Cause</u>

Sturm Ruger also challenges Judge McAuliffe's determination that there was probable cause for issuance of an administrative search warrant. This ruling is a question of law subject to <u>de novo</u> review. <u>See</u> <u>Sawyer</u>, 144 F.3d at 193.

The legal standard for finding probable cause for an administrative search is less burdensome than that required in the criminal context. <u>See</u> <u>Sturm Ruger I</u>, 903 F. Supp. at 242-43, <u>aff'd on other grounds</u>, 84 F.3d 1 (1st Cir.), <u>cert. denied</u>, 117 S. Ct. 480 (1996). In <u>Marshall v. Barlow's Inc.</u>, 436 U.S. 307 (1978), the Court held that probable cause for an administrative warrant could be based on a "showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'" <u>Id.</u> at 320 (alterations in original) (quoting <u>Camara v. Municipal Court</u>, 387 U.S. 523, 538 (1967)). A "warrant showing that a specific business has been chosen for an OSHA search on the basis

19

of a general administrative plan for the enforcement of the Act derived from neutral sources . . . would protect an employer's Fourth Amendment rights." Id. at 321.

Sturm Ruger contends that the Interim Plan is neither general, reasonable, nor neutral, since it: (1) targets industries for inspection at the "four-digit" SIC code level; and (2) uses site-specific LWDII data. These characteristics, reflecting OSHA's intent to focus its resources on the highest incidence worksites in the highest incidence industries, however, support a finding that the Interim Plan is reasonable, and do not make the warrant unconstitutional. See Industrial Steel Prods. Co. v. OSHA, 845 F.2d 1330, 1334 (5th Cir. 1988) (reasonable for OSHA to target largest, most dangerous businesses, since OSHA resources are insufficient to inspect every establishment).

As to the question of the legitimacy of using data retrieved at a four-digit SIC code level, there are numerous cases confirming that such specificity is legitimate. See, e.g., Industrial Steel Prods., 845 F.2d at 1333; Donovon v. Trinity Indus., Inc., 824 F.2d 634, 636-37 (8th Cir. 1987). The mere fact that there are few companies in New Hampshire that fall within the selected SIC codes is irrelevant in the context of an administrative inspection plan that is nation-wide in scope. Cf. Donovan, 824 F.2d at 637 (if companies were ranked for inspection

20

by county name only in one state, inspection plan could be suspect, but considering that same procedure is used nation-wide, "the potential for abuse is nonexistent"). The establishments that were selected for the first cycle of inspections under the Interim Plan were drawn from a pool of more than 3,300 employers in nearly 100 industries. See U.S. Department of Labor, News Release No. 98-144 (April 13, 1998), Ex. A to Sturm Ruger's Mem. of Law in Support of Supp'l Mot. to Quash. That number is sufficiently large to allay the concern that the Interim Plan impermissibly focused on any one establishment.

As to the question of the neutrality of the criteria, it is beyond dispute that the Interim Plan relies on numeric, objective criteria. According to the Government, data were collected from more than 80,000 employers nationwide, based on, among other things, Dun and Bradstreet information regarding the identity of establishments. Worksites with higher than industry-average LWDII rates were selected out of the top 99 industries with the highest LWDII rates overall. Thereafter, OSHA headquarters randomly selected ten establishments within each local OSHA Area Office's bailiwick for the first round of inspections. Companies with an insufficient number of employees and companies subjected to comprehensive safety and health inspections since January 1, 1996 were eliminated from the field of targeted establishments.

21

There is no room for constitutionally-suspect, unbridled discretion in this process. None of the materials cited by Sturm Ruger regarding OSHA's alleged "gerrymandering" of these procedures to target Pine Tree, see, e.g., Exs. C-G to Sturm Ruger's Reply to Order (document no. 20), manifests any improper, non-neutral decision-making, or any other improper decision-making outside of the bounds of the procedures outlined in the Interim Plan.

As to the Interim Plan's reliance on site-specific data, the Supreme Court has indicated that an administrative plan based on such specific criteria may be constitutionally permissible. The criteria endorsed with respect to the targeting of an entire area for routine housing-code compliance inspections in Camara v. Municipal Court were the characteristics of the targeted area. See 387 U.S. at 538 ("reasonable legislative or administrative standards for conducting an area inspection" may include "the passage of time, the nature of the building (e.g., a multifamily apartment house), or the condition of the entire area"). Such criteria are analogous to the LWDII statistics for particular establishments under the Interim Plan, since such data may suggest the need for further investigation even without providing conclusive proof that there are violations present in any particular establishment. The Camara Court considered such

22

criteria regarding the area to be inspected to be sufficiently neutral and reasonable to satisfy the Fourth Amendment's requirements for an administrative search. By analogy, the use of establishment-specific LWDII rates to delimit the scope of the Interim Plan inspections is similarly legitimate.

The First Circuit upheld an OSHA administrative warrant based on the application of industry-specific data. The specific selection criteria in that case were the following:

> "[S]pecific industries are selected for inspection on the basis of the injury rate for that industry in the Commonwealth of Massachusetts. The injury rates are based on summary Workmen's Compensation data for serious injuries involving lost workdays. All establishments in the high-hazard industries are subject to inspection. The actual industries selected are those with the highest injury rates in the Commonwealth of Massachusetts. Once all establishments within the industry with the highest injury rate are visited, the establishments within the next highest-hazard industry are inspected, and so on."

Donovan v. Wollaston Alloys, Inc., 695 F.2d 1, 2 n.1 (1st Cir. 1982) (quoting affidavit in support of warrant application). Such criteria resemble the establishment-specific data used in this case.

In an even more closely analogous context, this court previously upheld the targeting of Sturm Ruger for subpoena enforcement based on injury data specific to Sturm Ruger. See Sturm Ruger I, 903 F. Supp. at 248-49, aff'd on other grounds, 84 F.3d 1 (1st Cir.), cert. denied, 117 S. Ct. 480 (1996). In

23

particular, the data at issue indicated that: "(1) the Company is a member of an industry in which the rate of multiple movement disorders is significantly higher than average; and (2) the Company itself had a very high incidence of multiple movement disorders."  Id. at 248.  The simple fact that the plan at issue in Sturm Ruger I took into account data specific to Sturm Ruger did not make the criteria non-neutral or raise red flags regarding the concerns that motivated the Marshall v. Barlow's Court to require a warrant in the first place.  The targeting of Sturm Ruger under the plan was found to be "the product of a systematic, nonarbitary process, and was not based upon 'the unbridled discretion' of a field agent."  Id. at 249.  See also Wollaston Alloys, 695 F.2d at 5 (main concern of Court in Marshall v. Barlow's was potential for "'unbridled discretion' in the hands of inspection officers," in absence of warrant requirement).

Therefore, I find that the targeting of Pine Tree pursuant to the Interim Plan involved only the application of neutral criteria pursuant to a general administrative plan.  The requirement for administrative probable cause under the Fourth Amendment has been satisfied.  Therefore, Sturm Ruger's constitutional challenge to Judge McAuliffe's probable cause determination must be rejected.

24

## IV. Comprehensive Scope of Warrant

Sturm Ruger's final argument is that the warrant is over-broad, since it authorizes a wall-to-wall search. In particular, Sturm Ruger analogizes this case to cases involving inspections based on employee complaints and contends that the warrant's scope should have been more narrowly focused, as courts in certain Circuits have required.

While there is apparently a Circuit split, and no controlling First Circuit law, with respect to whether searches based on employee complaints must be limited in scope, this case concerns a programmed inspection, not an inspection based on an employee complaint. Comprehensive inspections are permissible in the context of a programmed inspection. Where the trigger for the inspection is a neutral administrative plan, as in this case, not an employee complaint, the field inspector's discretion is necessarily limited and there is no risk that the inspection is the product of a disgruntled employee's intent to harass the employer.

> Because administrative and legislative guidelines ensure that employers selected for inspection pursuant to neutral administrative plans have not been chosen simply for the purpose of harassment, courts have held that administrative plan searches may properly extend to the entire workplace.

Trinity Indus., Inc. v. Occupational Safety and Health Review Comm'n, 16 F.3d 1455, 1460 (6th Cir. 1994). "Notably, a wall-to-

25

wall inspection implements the broad remedial purpose of the OSH Act to ensure that employees are provided a safe workplace." Martin v. International Matex Tank Terminals-Bayonne, 928 F.2d 614, 626 (3d Cir. 1991).

Sturm Ruger alleges that OSHA had access to Pine Tree's OSHA 200 logs in June 1998, before the warrant was obtained on July 6, 1998.[5]  Judge McAuliffe, however, based his decision to issue the warrant solely on the information in the warrant application, which did not include these logs.  Sturm Ruger has not attempted to argue that the omission of these logs from the application manifested OSHA's intent to mislead the court regarding the appropriate scope of the warrant.  Nor are there any facts suggesting such an intent, since the reason for targeting Sturm Ruger was not specific evidence of an OSHA violation.

In any event, while Sturm Ruger contends that the logs provide information that should have limited the warrant's scope, Sturm Ruger does not clarify what such a limitation might be.  I cannot discern any appropriate limitation from reviewing the logs

---

[5]Sturm Ruger's Director of Human Resources, in the context of describing OSHA's appearance at Pine Tree on June 15, 1998, states that she "forwarded" to OSHA the injury and illness logs for employees working primarily in the Pine Tree operation.  See Declaration of Lynn Merrill at ¶ 13 (July 22, 1998), Ex. K to Supp'l Mot. to Quash.  Sturm Ruger contends that this information was provided to OSHA in June 1998, and that OSHA could have used the logs to identify the types of injuries and their causes.  See Mem. in Support of Supp'l Mot. to Quash at 17.

26

included in Exhibit I to the Supplemental Motion to Quash. The logs do not identify any OSHA standards that might have been violated, or even the location in the facility where the injury occurred.

Warrants authorizing wall-to-wall programmed inspections have been upheld in the context of plans similar to that at issue here, which prioritized companies for inspection by, among other things, the lost work-day injury rate for the industry and the company's number of employees, and which excluded companies if their actual rates were less than the industry average. See, e.g., Donovon v. Trinity Indus., Inc., 824 F.2d at 635-37. Moreover, LDWII data demonstrating that a target company is a high-hazard workplace in a high-hazard industry can justify a wall-to-wall search. See In re Establishment Inspection of Cerro Copper Prods. Co., 752 F.2d 280, 283 (7th Cir. 1985) (wall-to-wall search justified in response to employee complaint where there is no evidence of employee's intent to harass, establishment is "high hazard workplace in a high hazard industry," no wall-to-wall safety inspection had occurred within previous fiscal year, no wall-to-wall health inspection had occurred within previous three years, and comprehensive inspection at this time would conserve OSHA resources). The information OSHA used to target Pine Tree included its

27

comparatively high injury rate (9.92) relative to the relatively high industry average (6.7), and the fact that no comprehensive inspection had been carried out at the facility within the relevant timeframe. Such information, made available to Judge McAuliffe, justifies the broad scope of the warrant.

Sturm Ruger cites to no decision requiring OSHA to use information from OSHA 200 logs to focus the scope of a programmed administrative inspection that is based on other, neutral criteria. Indeed, the Third Circuit has upheld the validity of a wall-to-wall search pursuant to a neutral administrative plan, even though OSHA was aware that the company's past history of violations related to noise and dust issues. See Pennsylvania Steel Foundry & Machine Co. v. Secretary of Labor, 831 F.2d 1211, 1216 (3d Cir. 1987). Similarly, the warrant's scope is appropriate in this case, because of factors including the neutral criteria applied by OSHA, the absence of an employee complaint, and the resulting lack of a risk of harassment.

## Conclusion

For the foregoing reasons, the court should deny the motion to quash and supplemental motion to quash (document nos. 2 & 6). The Government's motion to enforce the warrant (document no. 4) should be granted. Sturm Ruger should be ordered to submit to an inspection of Pine Tree in accordance with the warrant.

28

Any objections to this report and recommendation must be filed within ten days of receipt of this notice. Failure to file an objection within the specified time waives the right to appeal the district court's order. See Unauthorized Practice of Law Committee v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date: December 8, 1998

cc:  Richard D. Wayne, Esq.
     Patrick M. Walsh, Esq.